469 F.2d 1326
 NORTH CITY AREA-WIDE COUNCIL, INC., Appellants, et al.
v.
George W. ROMNEY, Secretary of Housing and Urban Development
Department of Housing and Urban Development, et al.
 No. 72-1865.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 16, 1972.
Decided Dec. 4, 1972
 
 William S. Rawls, Philadelphia, Pa., for appellants.
 Carmen C. Nasuti, Asst. U. S. Atty., Philadelphia, Pa., for Federal appellees.
 John Mattioni, Deputy City Sol., Philadelphia, Pa., for Municipal appellees.
 Before GIBBONS and JAMES ROSEN*, Circuit Judges, and LAYTON, District Judge
 OPINION OF THE COURT
 PER CURIAM:
 
 
 1
 This matter is before the court of appeals for the third time, and the end appears nowhere in sight. The case originated with a complaint, filed on August 15, 1969, in which North City Area-Wide Council, Inc., (NCAWC), a Pennsylvania non-profit corporation, and a number of individual plaintiffs, purporting to act on behalf of all individuals residing in and organizations operating in the target area of the Philadelphia Model Cities Program,[1] sought injunctive relief against the Secretary of Housing and Urban Development (HUD), the City of Philadelphia, and the federal and city administrators of the Philadelphia Model Cities Program. The basic dispute arose over the extent of participation by NCAWC in the Philadelphia demonstration program funded by HUD pursuant to the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. Sec. 3301 et seq. The dispute between NCAWC and HUD, as disclosed in the complaint, was principally over the degree of control by NCAWC over a group of non-profit corporations proposed to be formed for the purpose of assuming the operation, as distinguished from the planning, of various programs in the target area. As proposed in the city's April 30, 1969 supplemental application to HUD, a majority of the directors of four of the operating corporations and at least sizable minorities of the directors of three others were to be chosen by NCAWC. HUD envisioned a potential conflict of interest in that arrangement, since NCAWC would be responsible for evaluating the performance of the operating corporations. It therefore proposed an amendment whereby (1) no member of the board of directors of an operating corporation could be a member (director, presumably) of NCAWC, and (2) after the initial nominations no board member of an operating corporation would be selected by NCAWC. That suggested change was, and is, the basic bone of contention between HUD and NCAWC.
 
 
 2
 The district court refused to grant a preliminary injunction. It did not consolidate the hearing on plaintiffs' motion for a preliminary injunction with the trial on the merits. See Rule 65(a)(2), Fed.R.Civ.P. On November 12, 1969, it granted the city defendants' motion for summary judgment and dismissed the complaint.[2] On December 10, 1969, a notice of appeal was filed on plaintiffs' behalf. No application was made to the district court or to this court for injunctive relief pending appeal. Thus between November 12, 1969 and July 14, 1970, when this court decided the appeal, the city defendants remained free to do what in the stipulation filed by the parties they had disclosed they intended to do; that is; organize a new citizen participation group.
 
 
 3
 The first opinion[3] of this court thus was a review of the grant of a motion for summary judgment. The analysis of the legal issues proceeded on the assumption that, as alleged in the complaint, final federal agency action had taken place on July 3, 1969, when HUD responded to the city's June 9, 1969 supplementary statement designed to meet HUD's conflict of interest objections. The opinion refers to the language in Sec. 103(b)[4] and Sec. 103(a)(2)[5] of the Act, and to a HUD statement of policy.[6] Accepting at face value the allegation that the July 3, 1969 HUD letter represented final agency action within the meaning of section 10(c) of the Administrative Procedure Act, 5 U.S.C. Sec. 704, this court concluded that the action was both reviewable and illegal. The case was "remanded to the District Court for further proceedings consistent with this opinion." 428 F.2d at 758.
 
 
 4
 A hearing began on September 9, 1970, and continued through eight subsequent court days. Following that hearing the district court filed an opinion[7] containing detailed findings of fact and conclusions of law. The district court declined to issue a preliminary injunction and dismissed the complaint. An appeal to this court followed, this time on a full record.
 
 
 5
 The opinion of this court[8] recognizes that while the lawsuit has been pending a new citizen participation organization has come into existence and that the Model Cities Program has gone forward, and states:
 
 
 6
 "It is possible and we hope probable that the passage of time may have sweetened the minds of the parties to this suit and their representatives.
 
 
 7
 We must reverse the judgment and we will direct the District Court upon remand to enter an order providing:
 
 
 8
 1. That plaintiff, Area-Wide Council, be reinstated forthwith insofar as it may be the citizen participation organization for the Philadelphia Model Cities Program.
 
 
 9
 2. That Area-Wide Council as such citizen representation organization negotiate in good faith with the existing citizen structure for the purpose of integrating that structure into the organization of the Area-Wide Council.
 
 
 10
 3. That the City of Philadelphia negotiate with the Area-Wide Council in good faith for the purpose of entering into an agreement with it for the Council to act as the citizen representation organization for the Philadelphia Model Cities Program, the form of contract dated June 30, 1969 (Exhibit P-11) to serve as a basis for these negotiations, it being understood, however, that in accepting any contract, Area-Wide Council will not be bound by the illegal changes made in the Philadelphia Model Cities Program by the Hyde letter of May 27, 1969, the Watson memorandum of June 9, 1969, or the Baida letter of July 3, 1969.
 
 
 11
 4. That HUD and the City negotiate in good faith with the Area-Wide Council concerning all changes made in the Philadelphia Model Cities Program since May 27, 1969." 456 F.2d at 818.
 
 
 12
 In June the parties were back before the district court for the entry of a judgment in accordance with the direction of this court. The district court took evidence in open court, which apparently has not been transcribed, and entered a final permanent injunction as follows:
 
 
 13
 "1. That defendants . . . are hereby, mandatorily ordered and directed to reinstate forthwith . . . [NCAWC] as the citizen participation organization of the Philadelphia Model Cities Program.
 
 
 14
 [Compare court of appeals judgment: "1. That plaintiff [NCAWC] be reinstated forthwith insofar as it may be the citizen participation organization for the Philadelphia Model Cities Program." (emphasis supplied).]
 
 
 15
 2. It is hereby, ordered that the present contract between the City of Philadelphia and the Advisory Citizens Committee (ACC)[9] be and is hereby modified and reformed by substituting NCAWC for the ACC as a party to that contract with the City of Philadelphia. However, except for the current contract year or any extension thereof, NCAWC's substitution in such contract shall in no way bind NCAWC to any illegal changes in the Philadelphia Model Cities Program as more fully set forth in paragraph 6 of this Order nor any way affect the rights and obligations of the parties as set forth in paragraphs 1, 5, 6, and 7 of this Order. The contracts between the City and the Neighborhood Council[10] shall remain in effect for the current contract year or any extension thereof or until ACC is integrated into NCAWC, without prejudice to the rights of NCAWC. The Neighborhood Councils in performing their functions under these contracts shall do so under the supervision of NCAWC, to which they shall directly report.
 
 
 16
 [Compare court of appeals judgment: "2. That [NCAWC] as such citizen representation organization negotiate in good faith with the existing citizen structure for the purpose of integrating that structure into the organization of [NCAWC].]
 
 
 17
 3. That [the defendants], NCAWC and ACC, their officers, agents, servants, employees and attorneys be, and they are hereby, ordered and directed to continue current programs under the present Model Cities Contract, for the present contract year, as it may be extended.
 
 
 18
 4. . . . that there shall be no dismissal of current employees of ACC and NCAWC and the Neighborhood Councils, except for cause, during the current contract year or any extension thereof. In order to make available to NCAWC funds to accommodate the hiring of staff, defendants . . . are hereby, ordered and directed to provide an additional sum up to $15,000.00 per month to the NCAWC for this purpose under the reformed contract between NCAWC and the City of Philadelphia as provided in paragraph 2 hereof.
 
 
 19
 5. That plaintiff NCAWC, its officers, agents, servants and attorneys be, and they are hereby ordered and directed to negotiate in good faith with the existing citizen participation structure for the purpose of integrating that structure into the organization of plaintiff NCAWC.
 
 
 20
 [See paragraph 2 of court of appeals judgment]
 
 
 21
 6. That [the city] defendants . . . be, and they are hereby ordered and directed to negotiate with . . . NCAWC in good faith for the purpose of entering into an agreement in order for . . . NCAWC to act as the citizen participation organization for the Philadelphia Model Cities Program provided that the form of contract dated June 30, 1969 . . . attached . . . as Exhibit A[11] shall serve as a basis for these negotiations, and provided further that in accepting any contract . . . NCAWC shall not be bound by the illegal changes made in the Philadelphia Model Cities Program by (a) the [HUD] letter dated May 27, 1969 . . . (b) the Supplementary Statement dated June 9, 1969 . . ., and (c) the letter dated July 3, 1969. . . .
 
 
 22
 [See court of appeals judgment: "3. That the City of Philadelphia negotiate with [NCAWC] in good faith for the purpose of entering into an agreement with it for [NCAWC] to act as the citizen representation organization for the Philadelphia Model Cities Program, the form of contract dated June 30, 1969 . . . to serve as a basis for these negotiations, it being understood, however, that in accepting any contract, [NCAWC] will not be bound by the illegal changes made in the Philadelphia Model Cities Program by the . . . letter of May 27, 1969, the . . . memorandum of June 9, 1969, or the . . . letter of July 3, 1969."]
 
 
 23
 7. That defendants . . . be, and they are hereby, ordered and directed to negotiate in good faith with [NCAWC] concerning all changes made in the Philadelphia Model Cities Program since May 27, 1969.
 
 
 24
 [See court of appeals jugment, p 4].
 
 
 25
 8. That plaintiff . . . recover . . . its costs . . .
 
 
 26
 9. That this Court retain jurisdiction."
 
 
 27
 Thus the permanent injunction in paragraphs 1 and 2 purported to substitute NCAWC as a party to an existing contract in the place of ACC, while in paragraph 6 it ordered the city defendants to negotiate with NCAWC for a new contract. The injunction, in paragraph 2, integrated the neighborhood council subsidiaries of ACC into the structure of NCAWC, while at the same time, in paragraph 5 it ordered NCAWC to negotiate with ACC for the purpose of integrating that structure into its organization.
 
 
 28
 Faced with these directions, NCAWC and ACC approached the bargaining table. As disclosed in NCAWC's memorandum to the district court, filed on August 31, 1972, this took place:
 
 
 29
 1. The NCAWC contract: NCAWC took the position that paragraphs 1 and 6 of the permanent injunction substituted it for ACC in the contract between ACC and the city of Philadelphia. The city took the position that NCAWC must, pursuant to paragraph 5 of the injunction, negotiate and sign a contract. NCAWC would agree to this only if the provisions removing NCAWC from control of the operating non-profit corporations were deleted. Thus the city and NCAWC bargained to the identical impasse as had occurred in June of 1969. This time, however, NCAWC contended that the effect of our prior decisions was not merely that HUD's conflict of interest position had not been the subject of negotiations, but that it had been adjudicated to be illegal. The city defendants refused to permit any amendments except one which stated that the provisions of the provisional contract would not bind future contracts. Finally, in hopes of promptly obtaining the $15,000.00 a month provided for in paragraph 4 of the injunction, NCAWC signed the city's form of contract, while still maintaining that its provisions are illegal. That contract expires by its terms on December 31, 1972, with the expiration of the current HUD-city Model Cities Contract.
 
 
 30
 2. The NCAWC-ACC negotiations: The party and the non-party bargained to impasse over the insistence of ACC that its present head become co-chairman of NCAWC. The latter took the position that since the injunction substituted it as a party to the contract with the city, its chief executive should not have to share his responsibilities with the ACC head. Meanwhile NCAWC experienced difficulties in asserting the authority over the non-party Neighborhood Councils provided for in paragraph 2 of the injunction.
 
 
 31
 3. A contract for continuation of the Model Cities program: The city took the position that no permanent contract for continuation of the Model Cities program could be entered into with NCAWC (for the period after December 31, 1972, which will require new federal funding) until the integration of NCAWC and ACC has been accomplished. NCAWC took the position that such integration is not required and that both the city and HUD must negotiate with it, and it alone, for a future contract. It took the position that it would commence such negotiations at such time as the city began paying the $15,000.00 a month. The parties are still apparently at impasse over the terms of any new contract, and the December 31, 1972 expiration date is fast approaching.
 
 
 32
 The attorneys for the parties conferred with the district court informally, and the city defendants suggested that the several impasses might be resolved if elections were held for the purpose of electing a NCAWC Board of Directors. NCAWC concedes that no such elections have been held since prior to May of 1969. On September 6, 1972, the district court ordered that such elections be held for a 56 member Board of Directors, with three persons elected from each Neighborhood Council or HUB, and eight members elected at large from the entire target area. The order also provided that this Board of Directors would elect the officers of NCAWC and that no person should serve as an elected board member of a Neighborhood Council who is at the same time an employee in a Model Cities project or a board member of a Model Cities Delegate Agency.
 
 
 33
 This third appeal followed.
 
 NCAWC contends on appeal:
 
 34
 (1) That the September 6, 1972 order violates the mandate of this court which, it urges, required its reinstatement, and the integration of ACC into it.
 
 
 35
 (2) That the September 6, 1972 order violates Rules 52 and 65, Fed.R. Civ.P., because it contains no findings of fact or conclusions of law.
 
 
 36
 (3) That the September 6, 1972 order was issued without due process of law because it was issued without adequate notice and without a hearing.
 
 
 37
 No contention is made that the district court lacked subject matter jurisdiction, and no contention is made that by providing in paragraph 9 of the permanent injunction "that this court retain jurisdiction" the district court violated our mandate.[12] NCAWC concedes that at some point elections for its Board of Directors should be held-but not now. In its motion for reconsideration and stay of the election order it gave this reason:
 
 
 38
 "Elections should not be held at this time because they will prevent [NC]AWC, and the citizens of the target area, from fully participating in the preparation of the third year action program prior to the dealine for submission of that program to the Department of Housing and Urban Development."
 
 
 39
 More accurately, NCAWC might have said that an election might have the effect of preventing the original officers of NCAWC from so participating because they might not be re-elected.
 
 
 40
 NCAWC applied for and obtained from a panel of this court a stay of the September 6, 1972 order. Thus the elections have not been held, the parties are still at impasse over the same issues which produced an impasse in June of 1969, and the December 31, 1972 date for submission of a new Model Cities Application is fast approaching.
 
 
 41
 Our mandate when the case was last before us, since it dealt with intervening contract rights of non-parties (ACC and the new Neighborhood Councils), should not be construed as NCAWC construes it, as a self-operating substitution of NCAWC for ACC. Rather, further proceedings in the district court must have been contemplated, and for this purpose that court properly included the provision retaining jurisdiction. To accomplish the integrating of NCAWC and ACC, which our last opinion contemplated, if negotiation failed some other step was required. The step chosen, elections in the target area for a NCAWC Board of Directors, was not inconsistent with our prior mandate, and was consistent with the statutory policy of "widespread citizen participation" in the Demonstration Cities and Metropolitan Development Act of 1966.
 
 
 42
 As to procedural deficiencies in the steps leading to the district court order, we hold that any which occurred were clearly harmless. Counsel for NCAWC received at least informal notice that the city was proposing elections. Counsel had an opportunity to state his position to the court. The absence of an evidentiary hearing is not crucial here, because the only new facts not developed in the earlier record are (1) the existence of the impasses discussed above, and (2) the fact that no elections have been held for a long time. Neither of these facts are in dispute. As to NCAWC's contention that the election should not be held now, we hold that the district court did not abuse its discretion in rejecting that contention because the reason advanced for postponing the election is patently inequitable. That reason, referred to above, comes down essentially to the desire of the present officers of NCAWC to continue the impasse with HUD over HUD's conflict of interest objection to NCAWC participation in the operating agencies of the Model Cities Program. Our prior decisions did not hold that by intransignence NCAWC could force HUD to yield on this issue, and did not suggest that HUD's position was inconsistent with the Act.
 
 
 43
 The stay granted by this court on September 25, 1972 will be vacated. The September 6, 1972 order of the district court will be affirmed. Since that order did not operate because of our stay, the case will be remanded to the district court for the entry of an order amending the September 6, 1972 order to fix a new schedule of dates for the prompt holding of elections. The mandate of this court will issue forthwith.
 
 
 
 *
 Judge Rosen heard argument in this case but died before the opinion was filed
 
 
 [1]
 No class action determination has been made to this date, and the proofs presented in the district court show no interest of the individual plaintiffs which would meet the jurisdictional amount requirement of 28 U.S.C. Sec. 1331. Jurisdiction is also asserted under 28 U.S.C. Sec. 1361, but it is at least questionable whether the relief sought would be available by way of mandamus. NCAWC, however, has established an interest in excess of $10,000.00, since federal funds for its operations far in excess of that amount are at stake. Thus, in the absence of any class action determination, we may treat the appeal as involving NCAWC
 
 
 [2]
 North City Area-Wide Council, Inc. v. Romney, Civil No. 69-1909 (E.D.Pa., November 12, 1969)
 
 
 [3]
 North City Area-Wide Council, Inc. v. Romney, 428 F.2d 754 (3d Cir. 1970)
 
 
 [4]
 "In implementing this title the Secretary shall-
 (1) emphasize local initiative in the planning, development, and implementation of comprehensive city demonstration programs,
 (2) insure . . . prompt response to local initiative, and maximum flexibility in programing, consistent with the requirement of law and sound administrative practice . . . ."
 
 
 [5]
 "A comprehensive city demonstration program is eligible for assistance . . . only if
 (2) the program is of sufficient magnitude . . . to provide . . . widespread citizen participation in the program . . ."
 
 
 [6]
 City Demonstration Agency letter, No. 3, October 30, 1967
 
 
 [7]
 North City Area-Wide Council, Inc. v. Romney, 329 F.Supp. 1124 (E.D.Pa. 1971)
 
 
 [8]
 North City Area-Wide Council, Inc. v. Romney, 456 F.2d 811 (3d Cir. 1972)
 [9. The new citizen participation organization.]
 [10. The new HUBS or neighborhood councils formed by the Advisory Citizens Committee.]
 [11. This is the form of contract tendered to and refused by NCAWC in July of 1969.]
 
 
 [12]
 Indeed after the entry of the permanent injunction, in apparent reliance on paragraph 9, NCAWC made an application to the district court for the further relief of the assessment of a $50,000 counsel fee against the defendants. That application remains undecided