COMPREHENSIVE GROUP HEALTH SERVICES BOARD OF DIRECTORS, an Unincorporated Association, by Oscar Shambourger, Trustee Ad Litem

and

Health Oriented Consumers, Inc., a Pennsylvania Non-Profit Corporation

v.

TEMPLE UNIVERSITY OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, a Pennsylvania Non-Profit Corporation

and

City of Philadelphia

and

Philadelphia Anti-Poverty Action Commission

and

Samuel L. Evans, Individually and as Chairman of the Philadelphia Anti-Poverty Action Commission

and

Melvin L. Hardy, Individually and as Executive Director of the Philadelphia Anti-Poverty Action Commission.

Civ. No. 71–2157.

United States District Court, E. D. Pennsylvania.

Aug. 8, 1973.

Elliot B. Platt, Community Legal Services, Inc., Philadelphia, Pa. (Theodore Clattenburg, Jr., David L. Hill, Jonathan M. Stein, Laurence M. Lavin, Philadelphia, Pa., on the brief), for plaintiffs.

Peter Platten, Richard Z. Freemann, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendant Temple University.

Ronald M. McCaskill, Philadelphia, Pa., for defendant City of Philadelphia.

Isaiah W. Crippins, Philadelphia, Pa., for defendants Philadelphia Anti-Poverty Action Commission, Evans, and Hardy.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

#### A. *Legal Background*

The Economic Opportunity Act of 1964 (Act) [1] authorizes federal grants for the operation of Community Action Programs,[2] including Comprehensive Health Services programs.[3] This case involves one of these Community Action Programs. In 1967, a Philadelphia city ordinance created the Philadelphia Anti-Poverty Action Commission (PAAC) to administer and coordinate community action programs within the city.[4] PAAC is a "community action

---

1. 42 U.S.C. § 2701 et seq.

2. A community action program is a community based and operated program which includes a sufficient number of projects or components to provide a range of services and activities having a measurable and potentially major impact on causes of poverty in the community or those areas of the community where poverty is a particularly acute problem. 42 U.S.C. § 2790(a).

3. Other community action programs include Project Headstart, Follow Through, Legal Services, Emergency Food and Medical Services, Family Planning, and Senior Opportunities and Services. 42 U.S.C. § 2809.

4. The ordinance establishes a commission of not fewer than 31 nor more than 45 members, all appointed by the Mayor. In accordance with the requirements of the Act, 42 U.S.C. § 2791(b), the ordinance requires three components of membership: one-third are public officials; one-third are representatives of certain named business, labor, religious, charitable, and social service organizations; and one-third are democratically elected representatives from each of the twelve Community Action Councils (CAC's) representing the various poverty areas of the City. Each CAC has twelve members nominated and elected by residents of the poverty area it serves.

agency" (CAA) within the definition of the Act. The same year, funded by a grant from the federal Office of Economic Opportunity, OEO, PAAC, and Temple University of the Commonwealth System of Higher Education (Temple) established the Comprehensive Group Health Services Center at 2539 Germantown Avenue, Philadelphia, and the West Nicetown-Tioga Neighborhood Family Health Center at 3450 N. 17th Street, Philadelphia, to provide comprehensive health services to inhabitants of the Hartranft, West Nicetown, and Tioga sections of the city. PAAC is the recipient of the grant for the funding of the centers and distributes the funds to Temple, which, as the so-called "delegate agency," administers the program and provides the bulk of the necessary technical resources.

Noting that the causes of proverty include lack of education, poor health, absence of a marketable skill, and unstable family life, the Act sets in motion a comprehensive effort to attack the causes of poverty by coordinating the antipoverty efforts of federal, state, and local governmental agencies and private non-profit agencies, by using innovative techniques in the development and implementation of programs, and by requiring the active involvement of the people to be served. Central to the structure of the Act is the notion of "community action," the belief that local citizens understand their communities best and that they will provide leadership by developing and implementing local programs.[5]

The concept of active involvement of the people to be served is one of the most important, as well as innovative, features of the Act. The purpose of the

Congressional requirement of citizen participation is explained in the first section of Title II [6] of the Act:

> [T]o promote . . . (4) the development and implementation of all programs and projects designed to serve the poor or low-income areas with the *maximum feasible participation of residents of the areas and members of the groups served,* so as to best stimulate and take full advantage of capabilities for self-advancement and assure that those programs and projects are otherwise meaningful to and widely utilized by their intended beneficiaries . . . ."

42 U.S.C. § 2781(a)(4) (emphasis added). With respect to Comprehensive Health Services programs specifically, the Act provides that they shall include programs "designed . . . (ii) to assure that . . . services . . . are furnished in a manner most responsive to [the] needs [of low income residents of the target areas] *and with their participation* . . . ." 42 U.S.C. § 2809(a)(4)(A) (emphasis added).[7] As will be seen, the notion of maximum feasible community participation is the touchstone of this case, which raises questions of the role of a community participation component of a comprehensive health services program and of the manner in which such a component may legally be altered.

The Act itself does not amplify the community participation concept. The meaning of that concept is, however, fleshed out in the OEO Regulations on community action programs in general, 45 C.F.R. § 1060 et seq. (Regulations), and in the OEO Guidelines (Guidelines) governing comprehensive health services programs.[8] We will review the statuto-

---

5. *See* 1964 U.S.Code Cong. & Admin.News 2900, 2909.

6. Title II, 42 U.S.C. §§ 2781–2837, is the part of the Act dealing with community action programs.

7. The Act is honeycombed with similar references. The section of the Act dealing with the development of neighborhood centers speaks of them as a vehicle "to pro-

mote maximum participation of neighborhood residents in center planning, policymaking, administration, and operation." 42 U.S.C. § 2811.

8. On December 14, 1970, pursuant to an Executive Directive and a Memorandum of Understanding executed on November 2, 1970, between the Director of OEO and the Secretary of the Department of Health, Educa-

ry and quasi-statutory law before setting forth our findings of fact (this is a nonjury case) to aid in framing the issues and viewing them in an appropriate perspective.

The Regulations place a gloss upon the maximum feasible community participation language of the statute by requiring *"meaningful"* participation in all programs (see note 3) funded with community action moneys. The Regulations require, *inter alia,* that: (1) all funding applications explicitly indicate a course of action which will lead to improvement in the involvement of poor people in the community action programs; (2) all community action programs provide guidance, training, and technical assistance to poor people so that their involvement may be effective; (3) the poor be provided employment in all phases of community action programs; (4) delegate agencies involve poor people in the planning, operation, and evaluation of delegated programs, by establishing a program advisory committee at least half of whose members are democratically selected representatives of the poor served by the program.[9] The program advisory committees, in addition to their program responsibilities, must have a strong voice in the development of personnel policies.

The Guidelines also deal directly with the effectuation of the community involvement concept. The Guidelines mandate that "neighborhood residents must share with the operating organization the responsibility for policy making" so as to maximize responsiveness to the community's needs. The specific means of giving a policymaking voice to neighborhood residents are detailed in the Guidelines:

The Neighborhood Health Council shall participate in such activities as the development and review of applications for OEO assistance, selection of the project director, the location and hours of the Center's services, the development of employment policies and selection of staff personnel, the establishment of program priorities, the establishment of eligibility criteria and fee schedules, the selection of neighborhood residents as trainees, the evaluation of suggestions and complaints from neighborhood residents, the development of methods for increasing neighborhood participation, the recruitment of volunteers, the strengthening of relationships with other community groups, and other matters relating to project implementation and improvement.

B. *The Dispute in This Case*

The plaintiffs, Comprehensive Group Health Services Board of Directors (CGHS)[10] and Health Oriented Consumers, Inc. (HOC), successor to the West Nicetown-Tioga Neighborhood Family Health Center Board of Directors (WNT) (collectively "plaintiff Boards"), are the community action program advisory boards that were established to provide the required community participation in the comprehensive health services programs involved in this case. CGHS was the advisory board for the Hartranft center at 2539 Germantown Avenue, and HOC was the advisory board for the West Nicetown-Tioga center at 3450 N. 17th Street.

---

tion and Welfare (HEW), control of funding for the centers was transferred to HEW. Despite this transfer, the parties agree that the OEO Regulations and Guidelines governing health centers, as well as parallel HEW Guidelines, are still applicable, under the terms of the Memorandum of Understanding.

9. Delegate agencies whose primary responsibilities are for programs not sponsored by the CAA (such as school boards) must establish an advisory board or committee

to assist in the planning, conduct, and evaluation of its [sic] community action programs. At least a majority of the membership of such boards must be democratically selected representatives of the poor served by the delegated community action program.

45 C.F.R. § 1060.1–2(b) (5) (iii).

10. An unincorporated association, CGHS sues by one of its members, Oscar Shambourger, as trustee ad litem.

In the spring of 1970, after the plaintiff Boards had been in operation for several years, PAAC and Temple determined that the two health centers should merge and accordingly be served by a single program advisory board. When the plaintiff Boards failed to work out a merger, they were removed by the defendants and replaced by a single newly created program advisory board, which plaintiffs consider a mere rubber stamp for the program decisions of PAAC and Temple.

After being displaced, plaintiff Boards brought this lawsuit for declaratory and injunctive relief. They ask that we permanently enjoin defendants from operating the centers without recognizing plaintiffs as, the community participation components thereof and from maintaining a new board without plaintiffs' participation therein, and that we declare that defendants acted illegally in purporting to dissolve and replace plaintiff Boards. The complaint also alleges that the defendants seized plaintiffs' files and denied them access to the centers, and seeks appropriate relief. Plaintiffs also ask that we declare that defendants have violated the Act, the Regulations, and the Guidelines by unduly narrowing the scope of plaintiffs' participation in program planning to exclude them from the preparation of the budget, the decision to undertake a health maintenance program,[11] and the selection and removal of the project director. The complaint includes a general allegation that defendants have refused "to permit plaintiffs to participate in policy decisions concerning the centers." Samuel L. Evans (Evans), PAAC's Chairman, and Melvin L. Hardy (Hardy), PAAC's Executive Director, are named as defendants because they played major roles in the events giving rise to the lawsuit. This litigation does not involve issues of any details of the actual operation of the health centers, and the delivery of health care to the community is not affected by this case.[12]

The dominant issue in the case is that of plaintiffs' displacement. The nub of their position on that issue is their as-

---

11. A health maintenance program is characterized by four factors: (1) it is an organized system of care; (2) there is a specified range of health services available; (3) there is an enrolled population group for whom the program accepts full responsibility for providing or arranging all health services; and (4) membership fees are prepaid at a fixed amount (prepaid capitation). The health maintenance plan in operation at the centers emanates from a contract made in July 1971 with the Pennsylvania Department of Public Welfare, which funds the plan. The Neighborhood Health Center program provides mostly primary, ambulatory care. The health maintenance program includes specialty care, secondary care, and inpatient care. Under both programs anyone meeting income and asset eligibility standards receives free care; others pay on a sliding fee scale.

12. At a conference in chambers shortly after the filing of this action, we denied plaintiffs' motion for a temporary restraining order and the parties agreed that the hearing on plaintiffs' motion for a preliminary injunction should be consolidated with the trial on the merits. The centers have continued to operate, as has the single program advisory board, in the interim. Defendants agreed to permit plaintiffs access to the centers.

However, nothing has been done, pending the litigation, to implement the terms of the October 24, 1969, agreement among PAAC, OEO, and Temple which requires that on or before January 1, 1972, PAAC and Temple shall submit to OEO for approval the name of an organization which both PAAC and Temple nominate to acquire title to the health center premises and to assume responsibility for the operation and administration of the centers. The agreement further provides that:

> This nominee shall be a non-profit corporation at least one-third of whose members are residents of the North Philadelphia area who would be eligible to receive services at the comprehensive health center pursuant to OEO directives. If OEO approves the nominee of PAAC and Temple, Temple shall forthwith convey title to the Premises to the nominee.

It was presumed by the plaintiffs that the nominee contemplated by the October 24, 1969, agreement would be the merged board. Indeed, the imminence of the January 1, 1972, date helped precipitate the lawsuit. The record did not develop what, if any, plans for transfer of title and operation of health centers by such a corporation might be made, and we cannot speculate upon the matter. The possibility does, however, heighten the importance of this litigation.

sertion that an established community participation component may be changed only with the full participation of the existing community board and in a manner that comports with standards of fair play, good faith negotiation, and due process of law, with the board participating meaningfully and effectively throughout the entire decision-making process. They submit that such did not occur here. In plaintiffs' view, if the delegate agency or grantee agency have different views from the plaintiff Boards on a subject such as merger, they are obligated to communicate those differences to the boards and to negotiate the differences in good faith. Plaintiffs contend that instead of doing that, the delegate and grantee agencies simply ordered the plaintiff Boards to merge, and then, when the command was not quickly enough implemented, proceeded summarily to exclude the community boards from the decision-making process and from the program, in violation of the Act. In essence, as plaintiffs see it, in order to represent the community effectively, the community boards must be autonomous, not dependent for their existence on the delegate and grantee agencies.

In terms of the other issue in the case, the general role of advisory boards vis-a-vis the Centers, plaintiffs contend that they were denied effective participation in important facets of policy-making and were not permitted to act as a community check and balance as required by the Act.

Needless to say, Temple and PAAC disagree with plaintiffs' view of the facts. Their position is that they created a unified board only when the foot-drag-ging and recalcitrance of the plaintiff Boards, each seeking to preserve its status and private domain, became intolerable. The defendants also disagree with plaintiffs on the law. Temple contends that the program advisory boards are the mere creations of the grantee and delegate agencies, who therefore have plenary power to remove the boards subject only to the limitations of good faith and continued community participation.[13] PAAC goes further and contends that participation of the program advisory boards is unnecessary because the maximum feasible community participation requirement was satisfied by the very presence of PAAC in the picture.[14] And both Temple and PAAC view the Boards' roles in policy matters in general more narrowly than do the plaintiffs.

This is not the first case arising in this Circuit addressing the question of the validity of change in a community participation component of a federally funded program. Although in a different context (the Metropolitan Development Act of 1966, better known as the Model Cities Act) [15] and under different operative facts, the United States Court of Appeals for the Third Circuit has written on three occasions in this general area, thereby establishing some important benchmarks. The three opinions are all in the same case: North City Area-Wide Council, Inc. v. Romney, 428 F.2d 754 (3d Cir. 1970); 456 F.2d 811 (3d Cir.), cert. denied, 406 U.S. 963, 92 S.Ct. 2063, 32 L.Ed.2d 351 (1972); 469 F.2d 1326 (3d Cir. 1973) (hereinafter "North City I, II, and III"). Regrettably there is no reported authority on the other points in the case and indeed there is precious little authority in any aspect of this nascent field of law.[16] Indeed,

13. Temple concedes that arguably the advisory board has the right to participate in the board replacement process, just as in other matters relating to project implementation, but claims that if such requirement exists, it was fulfilled.

14. PAAC did not file a post-trial brief, choosing instead to rely on Temple's brief.

15. 42 U.S.C. § 3301 et seq.

16. It is too early at this writing to determine the extent to which the case law will grow. On January 29, 1973, President Nixon submitted his 1974 budget message to Congress, setting forth the Administration's plan to transfer responsibility for certain OEO functions to other agencies. The Message specifically noted that: "No funds are requested for . . . [OEO] for 1974. Effective July 1, 1973, new funding for

this is one of the few cases under the Act developed on a full record as opposed to a preliminary stage of the proceedings. With the benefit of the foregoing background, we turn to our findings of fact.

## II. *Findings of Fact*

### A. *Identity of the Parties and Formation of the Programs*

Defendant Temple is a Pennsylvania non-profit corporation and a state-related institution of the Commonwealth of Pennsylvania. Defendant City of Philadelphia (City) is a municipal corporation. Defendant PAAC is an agency of the City created by City ordinance to administer federal poverty programs in Philadelphia and to provide certain services in connection therewith. It is a Community Action Agency within the terms of title II of the Economic Opportunity Act of 1964, 42 U.S.C. § 2790(a). At all times relevant hereto, defendant Evans was the chairman of PAAC and defendant Hardy was its executive director.

In mid-1967, in furtherance of the Comprehensive Health Services Program (Program), a community action program authorized by OEO pursuant to title II of the Act, 42 U.S.C. § 2790(a), PAAC and Temple established both the Comprehensive Group Health Services Center (CGHS Center) at 2539 Germantown Avenue, Philadelphia, and the West Nicetown-Tioga Neighborhood Family Health Center (WNT Center) at 3450 N. 17th Street, Philadelphia. What was thus created was a single program, operating through two centers, and providing a full range of health services to the Hartranft and the West Nicetown-Tioga sections of North Philadelphia respectively. Available services included medical care, dental care, preventive health services, pharmaceutical services, health out-reach services in the community, and health-related social services.[17]

On October 20, 1967, PAAC, by contract and in accordance with law, delegated to Temple the function of administering the Comprehensive Health Services Program. Temple continues to be PAAC's delegate agency for this community action program. PAAC serves as grantee for the funding for the program and distributes the funds to Temple.

. . . [Community Action Agencies] will be at the discretion of local communities. . . . With Community Action concepts now incorporated into ongoing programs and local agencies [if the Budget proposals are approved], the continued existence of OEO as a separate Federal agency is no longer necessary." On January 29, 1973, the Acting Director of the Office of Economic Opportunity issued a memorandum regarding the "termination of Section 221 [CAA] funding." All CAA programs other than phasing-out activities were to cease. An action was thereupon brought in the United States District Court for the District of Columbia seeking injunctive relief against the termination of CAA funding and against an "illegal reorganization" without Congressional approval. Preliminary injunctive relief was granted, *see* Local 2677, the American Federation, of Government Employees v. Phillips, D.C., 358 F. Supp. 60, but of course final disposition of the case may be some way off. Although it is true that the funding for Comprehensive Health Services programs now rests with HEW, rather than OEO, we also note that President Nixon, in a message to Congress on March 1, 1973, expressed the view that the approach of the past decade to what he described as human resources problems (encompassing the matters covered in the Act) had been found wanting because of excessive reliance on federal intervention and suggested that new directions were in order, principally in terms of increasing reliance on state and local governments in these areas. 1973 U.S.Code Cong. & Admin.News 522 et seq. Current news reports reflect significant Congressional opposition to the Administration proposals, so that it is difficult to predict the future of community action programs and of the type of approach to the problems of poverty which they represent.

17. Dr. Thomas Georges, Associate Vice President of the Health Sciences Center at Temple, testified that the program has approximately 310 employees, about 275 of whom are engaged in the delivery of services, and about 35 in program administration. In the four years of operation prior to the time of the trial, some 22,000 people had been provided approximately one million services.

Funding, initially provided by OEO, was transferred to HEW on December 14, 1970, pursuant to an Executive Directive and a Memorandum of Understanding executed on November 2, 1970, between the Director of OEO and the Secretary of HEW. The last grant for the Comprehensive Group Health Services program prior to trial was $5,180,323. In 1967 PAAC and Temple established an advisory board for each center to assist in the planning, conduct, and evaluation of the Comprehensive Health Services Program and to provide community participation.

## B. *The CGHS Board*

When it was established, the advisory board for the CGHS Center was an unincorporated association with offices at 2539 Germantown Avenue, Philadelphia, and was named Comprehensive Group Health Services Center Advisory Board. In bylaws adopted November 6, 1969, it changed its name to Comprehensive Group Health Services Board of Directors. Plaintiff CGHS was actually first formed as the Board for the Children and Youth Program at the St. Christopher's Hospital one year before Temple established the health centers.

The CGHS board resulted from a series of community meetings, subsequent to which an election was held to choose community representatives to serve on the board. As determined by PAAC and Temple, the elected community people comprised one third of the CGHS board, one third were appointed by the hospital, and the remaining third by the Area D Community Action Council.[18] Plaintiff CGHS also provided in its bylaws

that one third of the Board would be elected directly by community residents. The CGHS board comprises a cross section of the community and includes school-community coordinators, a housing trainee for the Model Cities Housing Information Center, a worker in Senior Wheels East (a Model Cities senior citizens' program), a taxi driver, a minister, a nun, a businesswoman, and the Deputy Commissioner of Health of the City of Philadelphia. Members of the CGHS board are also associated with numerous other community groups.

The last election for members of plaintiff CGHS was held on March 4, 1971, at the health center at 2539 Germantown Avenue. A description of the manner in which it was conducted is instructive. Approximately three weeks prior to the election, various members of CGHS working with community volunteers from the Hartranft Community Corporation distributed some 2,000 flyers written in English and Spanish door-to-door in the target area served by the CGHS Center. In addition, several posters giving information about the election were displayed in the health center, in the offices of the Council of Spanish-Speaking Organizations, at the Hartranft Community Corporation, and at the Holy Cross Church. The flyers gave notice of the election and invited each prospective candidate to submit a petition with ten signatures supporting his candidacy by February 26, 1971. On February 27, 1971, a list of the ten candidates submitting petitions was prepared by the Election Committee of CGHS. Flyers containing this list and giving the time and place of the election

18. Area D is one of the twelve CAC areas within the structure of PAAC. It comprises a sizeable area of North Philadelphia east of Broad Street between Norris Street and Erie Avenue with a population of 80,000. The Community Group Health Services Target Area is contained within Area D and has a population of 16,000. Under PAAC's Manual of Policy Guidelines and Procedures as compiled January 1968, each CAC has the full responsibility of selecting and proposing activities and programs that would constitute OEO Community Action Plans. The proposals are submitted to PAAC, and if approved are forwarded to OEO. Each CAC has its own bylaws and full organizational structure. Each CAC, by majority vote, elects a person to serve on PAAC's governing board. Each CAC is charged with seeking out the community leadership and community organizations for suggestions and keeping the community aware of its programs and activities and those of PAAC.

were thereupon distributed door-to-door throughout the target area of the health center. To vote in the election, a voter had to be at least eighteen years old and reside in the target area of the center. Each voter was asked to select five candidates from the list of ten. A total of 126 people voted in the election.[19] The five candidates receiving the most votes were selected. They were Lucy Smith, Oscar Shambourger, Margaret Jones, Sarah Murdock, and Joel Beamon.

## C. *The HOC Board*

The Board of Directors of the WNT center was originally appointed by Temple and PAAC and community organizations. A broad spectrum of people comprised the WNT board, including a clergyman, an attorney, an equal opportunities specialist with the United States Department of Housing and Urban Development, physicians, school coordinators, and a part-time reading aide with the Philadelphia public schools. Most members of the board were not professionals. When it was established, the

advisory board for the West Nicetown-Tioga Neighborhood Family Health Center was an unincorporated association with offices at 3450 N. 17th Street, Philadelphia, and was named the West Nicetown-Tioga Neighborhood Family Health Center Advisory Council. In January 1968 it changed its name to West Nicetown-Tioga Neighborhood Family Health Center Board of Directors. On April 20, 1970, it incorporated as Health Oriented Consumers, Inc. (HOC), a Pennsylvania non-profit corporation.[20]

## D. *The Boards in Operation: the Roles Which They Assumed; the Roles Which They Claim Were Denied Them; and Their Relationship with Defendants*

The primary concern of members of plaintiff boards was the delivery of health services to the community. Although they were not involved in the day-to-day operation of the centers, Board members sought to help form program policy.[21] Plaintiff boards in-

19. We feel constrained to observe that a voter turnout of 126 measured against a Hartranft area population of 16,000 is far from inspiring. In our experience, the ratio of registered voters to population is generally about 50% (as, for example, is the case with the City of Philadelphia, where there are presently slightly under one million voters amidst a population of slightly under two million), so that the CGHS election turnout represents approximately 1½% of the registered voters in the area. We note too that two thirds of the individuals selected for the single board created in August 1971 by the defendants were chosen by chairmen of the local CACs, the members of which have not been elected since 1969, although under PAAC's bylaws they are supposed to be elected every two years. (PAAC claims that elections have not been held because the City lacks the funds.) Indeed, PAAC's voting statistics are not much more impressive than those just cited. In the 1969 election the voter turnout in Area B, for instance, was only 3,000, out of 146,000 residents and presumably about 70,000 registered voters in the area.

There is no doubt that the Comprehensive Health Services program is functioning well in terms of furnishing much-needed health services to the community. But the pur-

pose of the Act was not merely to create clinics; it was also to involve the poor in the programs designed to improve their own condition so that such efforts could, enhanced by their insight and augmented self respect, be more effective. The final judgment as to the merits of the Act and its innovative community participation approach to poverty will be rendered in another forum (indeed, that judgmental process, see note 16, is presently underway). The factors to be weighed in that judgment will, of course, include the value of the services rendered by the clinics and the merit of the efforts of the community representatives on the program advisory boards (and we have given the latter high marks as well). However, since participatory democracy is a model for the community representation aspect of the program and a raison d'etre of the plaintiff Boards, the obvious failures of the program in this respect will doubtless be weighed as well.

20. The WNT target area has a population of some 25,000. It is a part of the CAC Area B, whose population is 146,000.

21. Each of the boards was allotted sums with which to operate. In the proposed budget for Program Year B (October 1, 1968, to September 30, 1969), CGHS was

formed their respective communities of the services available at the centers and arranged special programs for members of the community. Through committees they actively and vigorously recruited and screened applicants for employment at the centers, and they were constantly concerned about the upgrading of status and salary of community people employed at the centers.[22] They also recommended the establishment of grievance procedures for the staffs at the centers. HOC recommended hours that the WNT Center was to be open. CGHS was influential in establishing night hours at the centers and resisted an attempt by some doctors employed at its Center to shorten evening and weekend hours, because the Board knew that many community residents could come to the Center only at these times. Plaintiff boards also set priorities for which types of patients should be treated.

The foregoing is not intended as a catalogue of the activities of the plaintiff boards, for they performed many functions in the community, and we were impressed with their dedication. Indeed, in their refunding request for October 1, 1970, to September 30, 1971, Temple and PAAC represented to OEO that the functions of the CGHS and WNT advisory boards included, but were not limited to the following:

1. To advise on ways of accomplishing and evaluating the delivery of services and optimum use of the Center.

2. To make recommendations for improvements of the delivery of services.

3. To interpret services of the center to the community.

4. To hear views, complaints and ideas of people in the community in periodic public meetings, as well as informally, and to relay these to the center staff.

5. To assist in recruitment of staff, particularly with regard to the neighborhood health workers and to other staff from the neighborhood, and to serve as a screening function of all new hires prior to their appointment.

6. To participate in the selection of the Center Director.

7. To review and approve all fiscal transactions of Board members.

8. To participate in the development of the Program budget and approve the budget when finalized.[23]

Although this categorization is impressive, one of the wellsprings of this lawsuit is the feeling of the plaintiff Boards that they were not accorded a role commensurate either with the re-

---

allocated $9,125 and HOC was allocated $10,903. In the budget for Program Year C (October 1, 1969, to September 30, 1970), CGHS was allocated $17,212 and HOC was allocated $13,739. In the budget for Program Year D (October 1, 1970, to September 30, 1971), CGHS was allocated $19,498 and HOC $30,215. In Program Year E (October 1, 1971, to September 30, 1972), CGHS was allocated $24,637 and HOC $67,204. These budget items cover, *inter alia*, such matters as office supplies, secretarial assistance, travel, babysitting expenses, and meals.

22. Certain of the exhibits introduced at trial indicate that the Boards were at times quite aggressive in personnel matters, seeking promotions as well as employment for given individuals from the community, not unlike the patronage system found in the world of politics.

23. The refunding presentation adds that:

Each of the Boards has established the following committees: Executive; Personnel Screening; Finance; Physical Facilities; Grievance and Communications; Constitution and By-Laws; and certain ad hoc committees such as Equal Opportunity. Procedures have been established by the Program staff and the various committees, particularly the Personnel and Finance Committees. These committees meet periodically and the procedures which staff and the committees follow assure participation in the decision-making processes. For example, as has been mentioned, all new employees, professional and otherwise, must be approved by supervisory staff and the Personnel Committees. The Personnel Committees also function as appeal boards and actively participate in the review of pay plans and salary comparability studies.

funding request presentation or with the statutory command of maximum feasible community participation. It will be helpful to discuss the role dispute in two stages, first in general terms and then with specifics.

In general terms, we find that plaintiff Boards were not at all certain where authority in the program lay, and were confused as to guidelines and as to their own roles. On June 22, 1970, Harvey N. Schmidt, now a Common Pleas Judge but then a member of HOC and an attorney, wrote to Evans:

> I am now deeply concerned with the Board's exact function—what is its authority, what guidelines control it, etc.? It appears to me from the time that I have been on the Board and from the activities of Temple Hospital itself, that the Board is really a meaningless appendage to the whole program, and, if this is so, I certainly would not want to be any part of it.

While the plaintiff Boards constantly sought clarification of the division between administration and policy, the division was never definitively established.

The most notable and continuing source of friction between the plaintiff Boards and Temple and PAAC over the plaintiffs' role involved the Program Development and Evaluation unit (P. D. & E.) created by Temple to oversee the total health services program.[24] Members of plaintiff Boards continuously complained about the P. D. & E. unit. They expressed their concern over the various functions of P. D. & E. and over duplication of services rendered by P. D. & E. and the Boards. They felt that the P. D. & E. unit was top-heavy, resulting in too much expenditure on administration instead of services, and were concerned that they were not permitted to screen prospective P. D. & E. employees. But most of all, plaintiffs saw in P. D. & E. a usurpation of the power that they felt belonged to the Boards. P. D. & E. thus became a symbol of plaintiff Boards' frustration at their inability to be a partner in controlling the program, rather than a mere community input factor.[25]

Turning to specifics, the friction between the plaintiff Boards and Temple and PAAC over the question of role and responsibility manifested itself in a number of areas. *Inter alia,* the Boards felt that: (1) they were insufficiently involved in the program budget (see pp. 1083–1085 *infra*); (2) they were denied adequate training to fulfill their roles;[26] (3) they were deprived of input into the process of selecting James N. Snipe as project director of the health

---

24. That P. D. & E. was an important factor is demonstrated by the fact that in the budget for program year D, October 1, 1970, to September 30, 1971, the P. D. & E. unit was allocated a budget in excess of one million dollars, roughly 20% of the total of the program.

25. At a joint meeting of plaintiff Boards on December 10, 1970, for instance, it was moved that serious consideration be given to the elimination of P. D. & E. and that it be replaced with a corporation formed by the CGHS and WNT Boards. And in a "position paper" approved in November 1971, HOC proposed that the Boards as community representatives assume complete control over all aspects of the program, including receipt and disbursement of funds.

26. Plaintiffs frequently requested training from Hardy, Evans, and Temple but were not provided it. The boards thereupon sought training on their own through foundation funds and from universities. Hardy and PAAC's counsel, Isaiah Crippins, conducted orientation sessions but the Boards found them to be unsatisfactory. On the subject of funds, another source of friction was the complaint of CGHS that its members were not furnished adequate travel expense and babysitting funds to enable them to attend meetings. At one point, they apparently sought monogrammed briefcases, of which defendants make much, seeking to characterize the interest of the Board members in the program as one of pecuniary or status gain. While the taxpayers might well complain about monogrammed briefcases, the concern by the representatives of the poor that they not be forced to incur personal expenses that they cannot afford in order to serve productively on the advisory boards is certainly understandable and proper. In any event, we do not consider this aspect of the matter important in our deliberations.

services program (see p. 1085 *infra*), (4) they were not consulted with respect to Snipe's removal on August 12, 1971; (5) they were not consulted with respect to the appointment of Curtis Owens as acting project director to replace Snipe; (6) many of their recommendations as to Health Center operations were ignored, *e. g.*, the recommendation of HOC that the WNT Center be open on Saturdays; (7) they were largely ignored in connection with the institution of the Health Maintenance Plan, now in operation at the centers, which provides comprehensive free health care for public assistance recipients; (see note 11); [27] (8) Temple and PAAC wrongfully expropriated certain of their records and files; and (9) they were denied the power to hire and fire center personnel, which they felt (because of representations made by PAAC) that they had. We will presently make findings as to whether the plaintiff Boards were accorded their proper function with respect to the program budget and the selection of the project director. Because it is not necessary to the resolution of the case, we make no findings as to which side was justified with respect to the other differences.[28]

As may be surmised from the foregoing, the relationship between the plaintiff Boards and Temple and PAAC was poor, and was pervaded by suspicion and mistrust. On several occasions plaintiffs attempted to bypass the defendants and sought the direct intervention of OEO in the hopes of settling their difficulties. In a letter dated June 29, 1971, to Dr. Leon Cooper, Director of the Comprehensive Health Services Division of OEO in Washington, D. C., Elizabeth J. Wilson, Chairman of HOC's Board, observed:

Neither Temple University nor PAAC has been willing to negotiate an honest relationship with us, and we have been spinning our wheels over many minor problems while we have been rubber-stamping important documents and decisions made by the health providers which we did not understand at the time and have lived to regret.

Mrs. Wilson had previously sought Dr. Cooper's help after appealing to Hardy without receiving satisfaction. Indeed, the attitude which spawned this very lawsuit is articulated in a HOC position paper approved by its Board in November 1971, which asserts that Temple and PAAC set up the plaintiff Boards as "straw boards" and conspired to disband them and replace them with a real "straw board" as soon as the plaintiffs sought to strengthen the program. These findings with respect to the poor relationship between the plaintiff Boards and PAAC and Temple will assume great importance in the merger and displacement issue; indeed, they constitute the proximate background without which these issues cannot be fully understood.

A final finding in this area is that on or about August 17, 1971, representatives of Temple and PAAC transferred certain records, files and documents which plaintiffs believed belonged to them from the centers to the Beury Building. Plaintiffs were not consulted prior to the transfer of said property by any representative of Temple and PAAC, and were denied further access to the property except on a limited basis during the course of litigation.

E. *The Plaintiff Boards' Involvement in the Program Budget*

On the subject of the budgets, the plaintiff Boards' complaints were that

27. The Boards objected to certain fee provisions of the Health Maintenance program. They also felt that they had been deceived in connection with the adoption of the plan, and that false representations had been made with respect to the extent of support for the plan so as to engender what was in effect post hoc approval.

28. These other issues were not sharply enough tried to permit definitive findings, but they can, if necessary, be litigated in the future.

(1) they were permitted to see the budgets only after they had been fully prepared; (2) they often did not understand them; (3) they were rushed to approve them; (4) their suggestions for revision were never accepted; (5) certain budgets were submitted to OEO in Washington without their approval; and (6) they did not help put the budget together and could not seem to influence it.

Gloria Martin was a former chairman of the Finance Committee of WNT. She testified that:

> I was involved with the budget in that the budget was brought to us; and we went through the budget and took recommendations back to the Board. We were not involved in the writing up of the entire budget. . . . It was just brought to us for approval or recommendation for approval from the Board. . . . Well, we examined it but we really didn't help put it together. In other words, it was brought already made up, except for our own Board budget, the West Nicetown-Tioga budget. That was part of the over-all budget. That was the only thing we were involved in.

(N.T. 161–63). Mrs. Martin went on:

Q. You were involved in preparing the budget for your Board?

A. That was the only thing.

Q. And the other part of it related to what?

A. The over-all program and the centers. We weren't allowed to do anything with that—just, you know, scan through it more or less and bring recommendations to the Board.

Q. Was it clear when you scanned through it what it meant?

A. No, not all the time. But we couldn't really change anything. And this is all we could do.

Q. Well, when it was unclear did you request any clarification?

A. We did but the clarification was unclear also.

Q. Did it always come to you in a package form completed?

A. We received numerous materials on different forms on how to put it together, but we were never told how to fill out those forms and put it together.

Q. How did you receive it? Did you receive it at home?

A. Yes, through the mails, just pieces of materials.

Q. Did you as a Board member and the Board as you know it want to influence the budgets in any way?

A. Yes, we did. We wanted to know why certain things were put in; and why certain things were not put in. And we wanted to have something to do with what went in the budget, the over-all budget; especially talking about the West-Nicetown Tioga budget—I am sorry, the West-Nicetown Tioga Center.

(N.T. 163–64). In consternation, Mr. Shambourger of CGHS testified:

Q. Were budgets submitted to your Board as they were to the West Nicetown-Tioga Board?

A. We had a Finance Committee on our Board. And the budget would come completely finished to our Board, to our Finance Committee, which was supposed to look over that and to make changes and then report to the full Board. That was done. They looked over; they made changes; reported to the full Board. And when we got the budget back, it was like it was before when we made the changes.

(N.T. 189).

Rev. Harris also testified that the Boards were consistently rushed to approve the budgets. This testimony is corroborated by a memorandum concerning the Program Year D budget, October 1, 1970, to September 30, 1971, in which Ronald R. Dobbins, the Director of Administrative Services of the Program and its former Budget Officer, advised that recommended budgets were to

be submitted to the Finance Committees of plaintiffs on Monday, June 15, 1970, that the finance committees would have to complete their review by Monday, June 22, 1970, and that each board would take action on proposed budgets on Monday, June 29, 1970. The budget was to be submitted to PAAC for review on Thursday, July 2, 1970, and transmitted by PAAC to OEO in Washington on Friday, July 10, 1970.

We credit the testimony of Mrs. Martin, Mr. Shambourger, and Rev. Harris, particularly since the defendants' evidence does not contradict it. Dobbins was the principal defense witness on this point. At first he seemed to counter the testimony of the plaintiffs by a recitation of the quantum of time he spent reviewing budget matters with the plaintiff Boards. But as his testimony continued, it then appeared that the bulk of this collaboration concerned the Boards' own budgets, not the centers' program budgets. And, although Dobbins testified that he was always available to discuss the matter of the program budget with the members of the Board, we find from the evidence that neither he nor anyone else connected with the program took any initiative to do so or made a serious effort to involve the plaintiff Boards in the budgeting of the health services program.

F. *The Plaintiff Boards' Involvement in the Selection of the Project Director*

It will be recalled that the Guidelines specifically require community participation in the selection of the project director. The evidence is clear, however, that when James N. Snipe was selected as project director in January 1971, the plaintiff Boards were not consulted at all. Notice of the Snipe appointment reached the Boards through a letter dated January 12, 1971, in which Charles Howell, then acting vice president of Temple's Health Sciences Center,

simply announced the appointment and asked the written concurrence of the plaintiff Boards. Mrs. Mary Burnett of CGHS testified on the subject as follows:

Q. Mrs. Burnett, were you aware when Mr. Snipe was appointed project director?

A. Yes, I was.

Q. Was your board as a board consulted or asked to participate in that selection?

A. No. We received a letter that Mr. Snipe was appointed as Project Director.

(N.T. 424). We credit this testimony and find that the plaintiff Boards were ignored in the process of selecting Snipe as the Project Director.[29]

We also find that plaintiffs were not consulted when Snipe was removed as project director and Curtis Owens appointed as acting project director in his place. Indeed, Evans stated that Snipe's dismissal "was a matter for PAAC and Temple." While these latter facts may assume less significance because they occurred in the summer of 1971 at the time that plaintiffs were about to be replaced, they are consistent with the general approach which we find Temple and PAAC took towards the plaintiff Boards, that of keeping them away from the decision-making process within the health program.

G. *The Matter of Merger: The Replacement of Plaintiffs by a New Single Program Advisory Board and the Reasons for Plaintiffs' Failure to Merge*

The fall of 1970 saw the first expression of the view that the plaintiff Boards should merge so as to form a more effective force. At a meeting of the WNT Board on October 20, 1970, James N. Snipe, then assistant project director of the program, recommended such a merger, as he again did in a

---

29. This conclusion is not affected by Shambourger's testimony that CGHS, at least, was pleased with the Snipe appointment.

memorandum dated November 17, 1970, to Arthur D. Nelson, then project director. In the same memorandum, Snipe also expressed the view that full decision-making authority and responsibility should be delegated to a merged board. At a WNT board meeting on November 24, 1970, two types of merger notions were discussed. Some expressed the view that what was in order was the formation of a "super board" over the two boards, but others favored outright merger, with the merged board replacing P. D. & E. in the program. The merger notion received impetus following a December conference in San Antonio, Texas, and in January 1971 CGHS formed a committee to work up a draft of bylaws that would govern a merged board.

In the period that followed, most of the discussions between the two Boards related to formation of a "super board." However, some members of plaintiff Boards were interested in outright merger. These people hoped to strengthen the power of the community representatives in dealing with PAAC and Temple, which were viewed with distrust, and to replace P. D. & E. with the merged board and ultimately assume full control over the program.

Temple and PAAC also favored merger, but for quite different reasons. The highest Temple official with responsibility for the program is Dr. Thomas Georges, Associate Vice President of the Temple Health Sciences Center. Dr. Georges, a former Secretary of Health and of Public Welfare of the Commonwealth of Pennsylvania, was appointed to the Board of Directors at WNT in February 1971. Based upon his experience with the program, he felt that a single board would be beneficial because it would increase community participation and would be concerned with the whole program and not just with one of the centers. PAAC chairman Evans believed that a single board would be the best structure in anticipation of a national trend toward multi-county comprehensive health programs. Evans also felt that creation of a single board could affect the use of other federal funds. However, as of mid-March 1971, nothing concrete had developed in connection with the merger situation.

By a notice dated March 18, 1971, the members of plaintiff Boards along with the members of the Area B and D CAC's and representatives of Temple and HEW were summoned by Evans to attend a meeting in the Mayor's reception room of Philadelphia's Municipal Services Building on March 23.[30] Evans opened the meeting by announcing that its purpose was to discuss the possibility of merging of the two boards. He described a merger as being consonant with a nationwide movement and important for the establishment of a comprehensive medical services delivery system for Philadelphia. Indeed, Evans touted the comprehensive plan and stressed that merger was a necessary part of its implementation. At first he suggested that merger had already been approved by the Boards, but that suggestion was quickly rejected by several of those present, whose response to Evans's presentation was far from sanguine. Indeed, a number of those present, including Rev. Robert L. Harris and Mrs. Mary James of the WNT Board and Oscar Shambourger of the CGHS Board, objected sharply to the merger proposal.

As the meeting progressed, Evans began to approach the merger decision as a *fait accompli*: the issue on the floor was not whether there would be a merger, but rather when the merger would take effect. According to Mrs. Neely of WNT, Evans simply decreed that CGHS and WNT could no longer operate as two boards and had six weeks to devise and form a new structure. Most emphatic on this point was Rev. Harris, Pastor of

30. Our findings as to what occurred at the meeting emanate from two sources: first, from the testimony of the witnesses who attended, and second, from certain minutes, prepared by Hardy's secretary, introduced as defendants' exhibit #33. The minutes are not a verbatim transcript.

the Tioga United Methodist Church, which is in the WNT target area. Rev. Harris testified that Evans told the Boards "that they had to unite or else." Rev. Harris went on:

Q Who informed the Boards that they had to unite?

A Mr. Evans.

Q And did he say why the Boards had to unite?

A He just said because they wanted it done.

Q Did he say how the Boards would unite?

A No. He left that up to the Boards to work it out as to how it was to be done. But he said he wanted one Board instead of two.

Q Did he offer any assistance if the Boards wanted it?

A No, sir. He gave us a deadline of six weeks. When I wrote back to them and asked for a meeting I was given an appointment with Mr. Evans. And then our secretary informed me the following day that the appointment was cancelled.

(N.T. 47–48). We credit Rev. Harris's testimony.

Evans continued the meeting in the same vein. He announced that if plaintiff Boards did not follow his "advice" to merge, then PAAC would, on his recommendation, retain Temple's attorneys to restructure the program. He also declared that he spoke for the community, and that if a comprehensive health plan was not prepared for Philadelphia, "then you are out of the picture." Evans also stated that he would see to it that his plans were effectuated. "I will use the power as Chairman of PAAC to make

any move . . . and we have the power to move this project. We will use the power if we feel it is justified. You will have nothing to say about what the Chair will say." By the foregoing findings we do not mean to indicate that only Evans and the PAAC hierarchy favored merger, for some of the members of plaintiff Boards did also. But PAAC had even determined the format for the new board. Hardy revealed at the meeting that the Board would be composed of thirty people, ten from Area B, ten from Area D, and ten from Temple. At the conclusion of the meeting, Evans stated that "time was of the essence" and reminded the Boards that they had only six weeks to effect the merger.[31]

Following the March 23rd meeting, the plaintiff Boards each deliberated upon the matter of merger into a single board. On April 13, 1971, at a joint meeting of the Boards, after a rather involved discussion of a variety of alternatives, they agreed to merge. Dr. Georges was present at that meeting and moved a successful resolution that the boards form a Joint Task Force Committee to work on the structure and function of the new board. Notwithstanding that resolution, however, and despite frequent meetings, the merger was not consummated quickly enough to suit PAAC and Temple.

There were a number of reasons why the merger's progress was slow. First, there were substantive problems. The target areas for the two centers were socio-economically different, the CGHS area being low-income and the HOC area being more middle class. Moreover, the CGHS center still encompassed the Children's Program, which was basically different from the rest of the program.[32]

---

31. While Dr. Georges was also present at the meeting and explained Temple's position in favor of a united board, he was careful to say that merger was dependent upon the agreement of those concerned. Dr. Georges testified that he did not recall Evans having demanded that the Boards merge. Hardy likewise denied that Evans gave the Boards orders, but we feel that he was evasive on the point. In any event, while we have great respect for both Dr. Georges and Mr. Hardy, we credit the version of the meeting related by plaintiffs.

32. According to the testimony of Mrs. James:

Tioga was concerned that: how could your group come up there and make determinations with Tioga when you don't know anything about our area.

Second, each group was unabashedly anxious about losing the identity it had labored so hard to establish.[33] Third, there was a pervasive distrust in the air, a product of the ill will between the Boards and PAAC and Temple, which impeded the Boards' ability to get along with each other in implementing what was essentially PAAC's directive. Fourth, the members of plaintiff Boards were people of limited backgrounds, unfamiliar with the mechanics of the merger; they also had other full-time occupations and they consequently acted more slowly than might otherwise have been expected.[34] We find in this regard that they received no help nor even an offer of help from Temple or PAAC in this endeavor. Fifth, the problem before the Boards was by no means a simple one, for there were indeed a considerable number of alternatives to forma-

tion of a single board. The problems of appropriate board composition in terms of the two areas involved and of the source and manner of community participation were sophisticated and would have challenged even lawyers and experts in the field.

By mid-July Temple and PAAC felt that plaintiff Boards had made no significant progress towards merger.[35] And, although there is nothing in the record that indicates any need for urgency, Evans and Hardy were persuaded that the time had come for forming a single board. On July 23, no merger having been effected, PAAC sent a letter, signed by its counsel, Mr. Crippins, to certain members of each of plaintiff Boards, informing them that Temple and PAAC had agreed to establish a single board, advising that they had been appointed as members, and inviting them

---

(N.T. 352). And Mr. Shambourger testified:

> A. We had problems of different areas. One area was considered very low income area. The other one was more middle class.
> Q. Which was the middle class of these two areas you are talking about?
> A. West Nicetown-Tioga.
> Q. West Nicetown-Tioga was middle class?
> A. We had problems because our program was different from theirs; with the Children and Youth Program in ours.

(N.T. 279).

33. Mrs. James testified:

> I can say that the CGHS Group were concerned that they might be left out; and that they had worked hard with the program; and that nobody wanted to be left out of the continuing service to the community.

(N.T. 352.) And Mr. Shambourger testified:

> We started a year before the other center. And we worked very, very hard at this. And we didn't want to get caught up in what we call a bond movement to a bigger area; and no one would be able to recognize our small group, you know, into this bigger area.

(N.T. 239).

34. Mr. Shambourger testified:

> Well, first we had to identify the problems which delayed the merger. And

once that was done—in the meantime other things were being done in other places. But we were constantly working toward this goal. We had no training. We had no background. And we were on our own trying to discover how we could do it.
> Aside from that, we were trying to hold two kinds of meetings at the same time; a meeting for the benefit of our subjects; and then we would meet at other times for the benefit of trying to get the two together to do a job for the total community. And it was a slow process. Learning is a slow process with this many people. And with this many people it was a very, very slow process.
> Q. . . . Can you tell us why the groups did not merge in a shorter period of time.
> A. Yes, it was difficult. It wasn't trained for that. But we were working on bylaws for the one group. And we were studying the incorporation of the Health Oriented Consumers so that our group could fit into this already incorporated body.

(N.T. 354, 238).

35. Apparently this feeling came from two sources: first, from Dr. Georges, who, as a member of WNT, attended about half of their meetings during this period, and who testified that it was his impression that they were making no progress; second, from the fact that no merger proposal was submitted by the Boards within the six week period allotted by Evans.

to a meeting on July 28. A half hour before the scheduled meeting, it was canceled. Evans thereafter called a meeting of PAAC's subcommitee on Community Action Councils for August 13, 1971, to discuss the "Temple Board." PAAC did not notify plaintiff Boards *qua* boards, although some Board members, by virtue of their connection with the Area B or D CAC's, were present. When the meeting opened, Evans reported that:

> At a recent meeting it was requested by the Chairmen of Areas B and D and representatives from Temple University that the two Boards be merged to form one Board. In order to structure the Board properly, since we were dealing with three organizations, it was decided that a Board of 30 Members be established with 10 representatives from Temple University, 10 representatives from Area B and 10 representatives from Area. D.

(This was the same proposal that Hardy had advanced on March 23.)

There were other speakers as well. Dr. Georges, on behalf of Temple, endorsed the notion of the single board and the proposed plan. And, although at the previous meeting of the subcommittee the subject of Board merger was not discussed, Mrs. Nannie Mae Barnes, Chairman of Area B CAC, and Mrs. Iris Glover, Chairman of Area D CAC, each supported the merger and announced that they had already chosen ten representatives from their CAC's to serve on the new board. Thereupon, according to the minutes:

> Mr. Stroman made a motion that

the recommendation of PAAC, Temple University and the Chairmen of Areas B and D be followed that the Board of Directors for West Nicetown-Tioga and Hartranft be merged into one Board. Miss Harrison seconded the motion, which was passed unanimously.

Upon approval of the resolution, Evans directed that the proposed new board members be promptly notified. This direction was implemented. Moreover, on August 17, 1971, Dr. Georges and Hardy sent to each member of the plaintiff Boards a letter stating that the boards had been dissolved. Plaintiff Boards were not consulted before defendants sent the August 17th letters, which stated that the action was taken pursuant to "guidelines" of Temple and PAAC. The fact, however, is that neither Temple nor PAAC had promulgated formal guidelines pertaining to the dissolution of community boards of community action programs. Indeed, the by-laws of PAAC provide that subcommittee action is not binding without approval by the PAAC board at a meeting after four days' notice. Yet PAAC had no meeting concerning the dissolution of plaintiffs as advisory boards or the plan to create a single merged board, thus casting additional doubt on the validity of Evans's actions.[36]

The new single board met on Tuesday, August 24. It was denominated "Board of Temple Comprehensive Health Services Program."[37] The new board thereupon elected officers and has since been functioning as a program advisory board for both centers.[38] We note that al-

---

36. The plaintiffs also contend that the CAC chairmen lacked the power to make appointments to the program advisory board. According to Hardy, PAAC's policy was that the chairmen had such powers, and he produced some 1961 resolutions of the various CAC's, including Area B, to the effect that the CAC chairman had the authority to make "appointments to all boards." Evans observed at the August 13th meeting that the CAC chairmen had "more power than they realize," including the power to remove someone from the program advisory board and replace him. We do not deem it necessary to rummage the structure of PAAC so

as to unearth the ultimate answer to the question of whether the CAC chairman had such appointive power. However, we do find that this manner of operation inveighs against the contention of the defendants that there was much community input in the replacement selection procedure.

37. Plaintiffs also objected to the fact that they had not been consulted with respect to something even so fundamental as the change in name.

38. We were so advised shortly before filing this Opinion.

though 13 of the 20 persons chosen to represent the community on the new board had previous program advisory board experience, no one who had previously voiced opposition to Temple or PAAC was named.

In terms of the statutory mandate of maximum effective community participation, however, it is important to examine the composition of the new board with respect to the residence of its members within the health center target area. As of August 17, 1971, of 22 members of CGHS, 12 resided in the target area served by the CGHS center,[39] and 20 resided within CAC Area D. As of the same date, 11 of the 18 members of HOC lived in the target area of the WNT center. Of the others, one was pastor of a church in the target area, and another had resided in the target area at the time of his appointment. Sixteen of the members resided within CAC Area B, and one of the others had resided within Area B at the time of his appointment. Thus, of the 40 members of the two boards, 23 lived in the health center target areas and 36 lived within the CAC areas.

On the other hand, of the 28 members appointed to the new board, only 6 resided within the target areas served by the two health centers, and only 18 within the areas of CAC's B or D.[40] Moreover, five of the members originally appointed to the new board, Nannie Mae Barnes, Johnny Davis, Iris Glover, Adele Pelzer, and William B. Mungin, are employees of the CAC's, and three others, Leo Hinson, Carmen Aponte, and Samuel Yarbrough, are employees of PAAC.[41] We note too that the CAC appointments to the board were never discussed at any CAC meeting.

We find, in accordance with the foregoing, that the new board has resulted in drastically decreased community participation. We do not credit Crippins's position that the presence of appointees of the CAC's acts as a talisman to fulfill the statutory command. The CAC areas are over five times the size of the program target areas. For instance, Mrs. Barnes lives at 6733 Emlen Street in the Germantown section. While that address is within the CAC area, it is in a far different socio-economic neighborhood than the target area. The vitality of the CAC appointments is further diluted by the fact that there has not been a CAC election since 1969.

The plaintiffs have characterized the new board as a rubber stamp for PAAC and Temple. While there is insufficient evidence in the record to support that broad conclusion, the minutes of the first meeting of the new board do establish that the new board approved a $9 million budget for program year E without any review. Indeed, a motion that a committee be formed to review the budget with Mr. Dobbins for presentation at the next meeting was withdrawn as "a vote of confidence to Temple." [42] Hence, plaintiffs' fears may be well founded.

The notice that they had been dissolved was far from the *coup de grace* to plaintiffs, for they continued their merger discussions and in fact effected the first stage of merger by formation of an interim single board in November 1971. That interim board is still functioning and plaintiffs intend to complete the legal work which will consummate the merger.

---

39. All nine elected community representatives resided within the target area; three of the eight CAC appointees resided within the target area; none of the five Temple appointees resided within the target area.

40. Moreover, one member residing within the target area and one member living outside the target area but within the CAC area have resigned since their appointment.

41. Temple's appointees to the new board were representatives of the community at large, chosen on the basis of their general background so as to add balance to the board and to complement the local community representatives.

42. Instead, a budget review committee was established in the event that amendments to the budget should be made.

H. *The Replacement of the Plaintiff Boards and the Question of Maximum Feasible Community Participation—A Synthesis*

Defendant Temple in its Requests for Findings of Fact has enumerated its reasons for the creation of a single program advisory board as follows:

(a) To increase the Program's efficiency and effectiveness.

(b) To increase the amount of community participation in the Program by increasing the percentage of community representatives on the Program's advisory board from 50% to 67%.

(c) To eliminate the counter-productive effects of having two advisory boards for a single Program.

(d) To expand the scope of concern of the Program's advisory board to include Program Development and Evaluation.

(e) To enhance the possibility of receiving more funds for use in the Program.

(f) To redirect the primary concern of the Boards' memberships from their own interests to the interests of the Program.

We regard these reasons as sincerely advanced; indeed they may well be valid. Moreover, although we have criticized Evans's method and approach, we do not doubt that the PAAC leadership was equally sincere in its belief that the plaintiff Boards should merge. But these observations are not dispositive of the questions before us.

In the succeeding portions of this Opinion, we will discuss the legal issues in the case, including the vexatious question of what "maximum feasible community participation" means. As will be seen in the course of that discussion, we believe that the law in this area is such that if, after the fullest dialogue and negotiation of differences in good faith, the plaintiff Boards and Temple and PAAC were to disagree on the subject of merger, then, even if the plaintiff Boards objected, Temple and PAAC would be free to act in such a way as to bring a merger about, so long as maximum feasible community participation inhered in the merged board. But that is not this case.[43] For, as the findings recited in the preceding sections of this Opinion make clear, the communications between the parties on the matter of merger were subjected, by Evans's presentation at the March 23 meeting, to an indelible taint.

The March 23 meeting hardly commenced in an ambience of mutual trust. The disagreements between the plaintiff Boards and Temple and PAAC over budget and personnel matters, training, and P. D. & E. were ongoing and pervasive. If the concept of maximum feasible community participation is to have any appreciable meaning, what the situation required was the initiation of a consultative process, a meaningful dialogue between PAAC and Temple and the program advisory boards concerning the merger proposal and, if merger was agreed on, the manner of achieving it. What emerged instead was a decree which, upon the elapse of the prescribed time, fell like a Damoclean sword upon the plaintiffs and severed them from the program. And even within its own contours the decree was restrictive, for Hardy had indicated to the meeting that the decision as to structure had already been made and that the new board would be composed of 30 people, 10 from CAC Area B, 10 from CAC Area D, and 10 appointed by Temple. Yet this was a decision in which community participation could have been especially fruitful.

Although the import of the foregoing findings for our ultimate decision is obvious, they, like findings of fact in general, are infused with meaning only by a discussion of the applicable principles of law. To this discussion we now turn.

---

43. Neither is the issue before us on these facts one of how long the defendants were required to wait for the plaintiffs' answer on merger; obviously, in another context, the defendants would not be required to wait indefinitely for plaintiffs to act.

## III. Discussion

A. *Preliminary Matters: Standing, Jurisdiction, Exhaustion*

Before reaching the questions of interpretation of the Act, we must address the contentions of defendants that plaintiffs lack standing to sue, that this Court lacks jurisdiction of the subject matter, and that plaintiffs have failed to exhaust administrative remedies. All of these contentions lack merit.

### 1. Standing

■ The law on standing has been substantially liberalized in recent years. Three years ago the Supreme Court articulated the "zone of interests" test to replace the test based on "recognized legal rights." Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The new test is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." [44]

In Lower East Side Neighborhood Health Council-South, Inc. v. Richardson, 346 F.Supp. 386 (S.D.N.Y.1972), just as here, a community participation component of a federally funded comprehensive health program sought a preliminary injunction requiring its continuation as the local agency to provide such community participation. Judge Lasker found "no merit" in HEW's contention that the Health Council lacked standing to press its claims, holding that as the previously officially recognized agency for providing mandated community participation in the program, the Health Council's interest met the *Association of Data Processing Service Organizations* test.

■ *North City I, supra,* was a suit brought by the former citizen participation component in the Model Cities Plan contesting changes made in the Philadelphia plan, which allegedly reduced citizen participation. The parties seemed to agree that *Association of Data Processing Service Organizations* concluded the standing issue. Judge Adams commented:

The issue of standing was not pressed by the Government on appeal, in view of the Supreme Court's recent decisions in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Accordingly, we may assume AWC here has standing to challenge the Secretary's grant to the City.

428 F.2d at 757. As we see it, plaintiffs are before the Court in a dual role. On the one hand, they represent themselves as legal entities, with substantial budgets, including certain incidental benefits to the Board members themselves, a considerable panoply of powers and responsibility, and, until properly displaced, a statutory entitlement to function.[45] On the other hand, by virtue of the statutory scheme, and upon the full record as it has been here developed, plaintiff Boards also represent the community. While Judge Lasker, in *Lower East Side, supra,* perceived that there might be a distinction between the legal interest of the plaintiff in that case *qua* council and the legal interest of the community residents, such a distinction does not appear from this record. Hence we find that the duality of interests plaintiff Boards seek to protect each fall well within the zone of interests created and

---

44. Article III of the Constitution restricts the federal judicial power to the resolution of "cases" and "controversies" but we do not understand the defendants' argument to be based on that point.

45. The Supreme Court recently reemphasized that standing is not confined to those who allege "economic harm." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S. Ct. 2405, 37 L.Ed.2d 254 (1973) ; *see* Association of Data Processing Service Organizations, *supra,* 397 U.S. at 153–154, 90 S.Ct. 827.

regulated by the federal statutes, regulations, and guidelines that govern comprehensive health services programs. The holding of *Lower East Side* and the clear implication of *North City I*, both of which are on point on the standing issue, support this conclusion.[46]

## 2. Subject Matter Jurisdiction

Plaintiffs' complaint asserts subject matter jurisdiction on three grounds. The first is 28 U.S.C. § 1331 (federal question jurisdiction). The second is 28 U.S.C. § 1343(3), which confers federal jurisdiction in civil actions commenced by any person "[t]o redress the deprivation, under color of any State law, . . . of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights . . . ." The third is 28 U.S.C. § 1343(4), which creates jurisdiction in suits "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ." (Plaintiffs have based their claim for relief on 42

U.S.C. § 1983, the 1871 Civil Rights Act, as well as on the Economic Opportunity Act.) Defendants contend that none of the three statutes confers jurisdiction in the case.

 We find that the Court is vested with jurisdiction in this case under 28 U.S.C. § 1331. The first requirement of that section is that the case "arises under the Constitution, laws, or treaties of the United States." As was noted in Warrington Sewer Co. v. Tracy, 463 F.2d 771, 772 (3d Cir. 1972):

> The test for determining whether a complaint presents a federal question is
>
> > "whether the complaint is for a remedy expressly granted by an act of Congress or otherwise 'inferred' from federal law, or whether a properly pleaded 'state created' claim itself presents a 'pivotal question of federal law,' for example because an act of Congress must be construed or ' "federal common law" govern[s] some disputed aspect' of the claim." (citations omitted) ·

46. Defendant PAAC's objection to standing rested upon the 1963 decision in Johnson v. Redevelopment Agency, 317 F.2d 872 (9th Cir. 1963), which was an action by residents of an urban redevelopment area to enjoin a municipal redevelopment agency from carrying out a redevelopment project on the ground that the agency had no feasible plan of relocation as required by law. The holding of the Ninth Circuit that the plaintiffs lacked standing to sue does not survive the Supreme Court's later standing decisions. As the Fourth Circuit noted in upholding the standing of residents to sue in a similar situation in M. M. Crockin, Inc. v. Portsmouth Redev. & Housing Authority, 437 F. 2d 784, 787 (4th Cir. 1971):

> Both HUD and PRHA challenge Crockin's standing to bring this action, but this issue, once a major impediment to litigants attacking urban renewal, no longer presents a serious problem. Recent opinions of the Supreme Court clearly indicate that cases denying standing to persons displaced by renewal projects should not be followed.

Defendant Temple's principal reliance is upon the case of Troutman v. Shriver, 417 F.2d 171 (5th Cir. 1969), cert. denied, 397

U.S. 923, 90 S.Ct. 915, 25 L.Ed.2d 103 (1970). In *Troutman*, the court denied standing to the plaintiff and four local bar associations (on a motion to intervene) who sought to challenge the legality of a community action legal services program because of its anti-competitive effect. One basis urged for standing was a statute requiring that state bar associations be consulted and afforded an adequate opportunity to make comments and suggestions. *Troutman*, however, is distinguishable in light of plaintiffs' dual status here: (1) as a statutorily required component of the program with a continuing participatory role in its own right, which, incidentally, benefited its own members; and (2) as a representative of the concerns of the community at large. · The bar associations in *Troutman* could not realistically claim either role. The *Troutman* decision recognized that the statute involved was not enacted for the protection of bar associations, but rather to benefit the public interest by ensuring optimal input into the decision-making process. Thus, shortly before the *Association of Data Processing Service Organizations* decision came down, the Fifth Circuit was already applying what was essentially the "zone of interests" analysis.

Ivy Broadcasting Co. v. American Tel. & Tel. Co., 391 F.2d 486, 489 (2nd Cir. 1968).

It is clear beyond cavil that plaintiffs' complaint seeks a remedy the source of which is the Economic Opportunity Act of 1964; hence the claim arises under federal law. Jurisdiction is conferred where plaintiffs allege a claim based on a right allegedly given by federal law. We cannot look to the merits of the existence of that right in deciding the jurisdictional issue.

We turn to the issue of whether the plaintiffs have met the second requirement of 28 U.S.C. § 1331, which is that "the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs." In terms of tangible value, we note that the budget for the Comprehensive Health Services Program for the year encompassing the dates of trial allotted $24,637 for the budget of the plaintiff CGHS and $67,204 for the plaintiff HOC. And the budget for the Program extending from October 1, 1970, to September 30, 1971 (the one in effect when the complaint was filed), allocated $19,498 for the budget of CGHS and $30,215 for the budget of HOC.

The stake of the plaintiff Boards in these budgetary appropriations alone would satisfy the jurisdictional amount requirement.[47] Because the plaintiff Boards exist as entities in their own right, we reject defendant Temple's claim that the $10,000 jurisdictional amount is satisfied only if each Board member can show an individual interest in the case amounting to at least $10,000.[48] As still further support for plaintiffs' property right claim, we note that the Boards have a property interest in their records and files which were appropriated by defendants (see pp. 1076, 1083).

But there is yet another reason why the $10,000 jurisdictional amount is met, for the law has long been that in injunction actions where the amount in controversy is a jurisdictional issue, the courts should look to the value of that which the plaintiffs are trying to protect. See Glenwood Light & Water Co. v. Mutual Light Heat & Power Co., 239 U.S. 121, 36 S.Ct. 30, 60 L.Ed. 174 (1915); John B. Kelly Inc. v. Lehigh Nav. Coal Co., 151 F.2d 743 (3d Cir. 1945), cert. denied, 327 U.S. 779, 66 S. Ct. 530, 90 L.Ed. 1007 (1946). An ex-

47. In *North City III*, 469 F.2d at 1328 n. 1, the Court of Appeals upheld § 1331 jurisdiction since federal funds for the operations of the community participation component, far exceeding $10,000, were at stake. *Cf.* Lower East Side Neighborhood Health Council-South, Inc. v. Richardson, *supra*, where Judge Lasker considered the loss of the plaintiff Neighborhood Health Council's budget financing as an irreparable harm factor in connection with an application for a preliminary injunction.

48. The plaintiffs present another plausible contention, *i. e.*, that they are third-party beneficiaries of the contract between OEO (and now its assignee HEW) on the one hand, and PAAC and its delegate agency, Temple, on the other. Under the contract, OEO or HEW promises to fund the health centers in return for PAAC and Temple's promise to administer the health services program in accordance with conditions and guidelines set by OEO and HEW. The terms and conditions of this contract are set annually in the refunding request as accepted by OEO or HEW, which specifically

designates plaintiff Boards as the recipients of substantial budgetary amounts, thus positing certain property rights. There are cases in which the application of the third-party beneficiary concept to contracts has been adopted by federal courts in applying general principles of contract law, and has been adopted by the courts of Pennsylvania in developing its common law. *See* United States v. Huff, 165 F.2d 720 (5th Cir. 1948); Hebah v. United States, 428 F.2d 1334, 192 Ct.Cl. 785 (1970); Commonwealth ex rel. Schnader v. Great American Indemnity Co., 312 Pa. 183, 167 A. 793 (1933). *But see* Johnson v. Redev. Agency, 317 F.2d 872 (9th Cir. 1963). Under those authorities, where the parties to an obligation indicate their intention to create an obligation in favor of a third party in their agreement, that third party as the right to sue on the contract. Ohio Cas. Ins. Co. v. Bank Bldg. & Equipment Corp., 300 F. Supp. 632 (W.D.Pa.1968). Thus, without deciding the question, the third-party beneficiary notion might buttress plaintiffs' position on the issues of both jurisdiction and standing.

amination of the budgets (defendants' exhibits 55 through 59) reveals that the Comprehensive Health Services program is currently a five million dollar annual operation. Plaintiffs, by their arguments that the defendants have disregarded the statutory requirement of maximum feasible community participation, have asserted a claim for protection of the integrity of the program. The value of that which plaintiffs are trying to protect thus far exceeds $10,000.[49]

A variant of this approach was taken by Judge Tenney in Bass v. Rockefeller, 331 F.Supp. 945 (S.D.N.Y.1971). *Bass* was a class action brought by a welfare recipient individually and on behalf of all others similarly situated seeking to restrain implementation of New York statutes reducing both the number of persons eligible for Medicaid and benefits and services provided such persons, without prior approval of the Secretary of HEW. Although there was no individual who could show an individual interest exceeding $10,000, and Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), forbade aggregation of "separate and distinct claims," Judge Tenney nonetheless upheld § 1331 jurisdiction. Finding precedent in a line of cases which focused upon the *collective interests* of plaintiffs who were uniting to enforce a single title or right in which they have a common and undivided interest,[50] he stated:

> The instant situation is legally indistinguishable from those cases heretofore discussed in which trust beneficiaries asserted a common and undivided interest in the proper adminis-

49. It may be contended that the right which plaintiffs seek to protect is not properly measured by the program budget, but rather is intangible. Yet, that consideration is no bar. In Spock v. David, 469 F.2d 1047, 1052–1053 (3d Cir. 1972), Judge Gibbons wrote:

> Indeed on the evidence in the record it seems at this juncture far more likely than not that the district court will ultimately hold that the value of some of the rights sought to be protected exceeds $10,000.00. Four of the plaintiffs are candidates for the nation's highest political offices. The rights of speech and assembly for which they seek protection are intimately connected with their quest for that office. Just as in an action for unfair competition we would look at the value of the trademark rather than at the extent of the infringement, Schering Corp. v. Sun Ray Drug Co., *supra* [3 Cir., 320 F.2d 72]; Ambassador East, Inc. v. Orsatti, Inc., *supra* [3 Cir., 257 F.2d 79], so in a political campaign we should look at the value of the campaign rather than at the extent of infringement of the constitutionally protected right to pursue it.

In Cortright v. Resor, 325 F.Supp. 797, 810 (E.D.N.Y.), rev'd on other grounds, 447 F. 2d 245 (2d Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972), Judge Weinstein stated:

> Free speech is almost by definition, worth more than $10,000, so that the allegation of jurisdiction based upon 1331 ought not be subject to denial.

And in Bass v. Rockefeller, 331 F.Supp. 945, 953 n.6 (S.D.N.Y.1971), Judge Tenney observed that "[c]ertainly the right to exist in society as relatively healthy people is worth more than $10,000." *Cf.* Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The program in question has provided some one million services over a period of four years (see note 17). Certainly the right of the community to have such a program meet the statutory command of maximum feasible community participation is worth in excess of $10,000. We note too that the law does not require plaintiffs to show to an absolute certainty that the amount in controversy exceeds $10,000; present probability is sufficient. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

50. Judge Tenney relied particularly on Berman v. Narragansett Racing Ass'n, 414 F.2d 311 (1st Cir. 1969). *Berman* was a suit by a group of owners of horses which had won purses at defendants' race tracks under an agreement whereby they were to receive 44.7% of the tracks' annual share of the bets. For over thirty years, the tracks had not included the "breakage" (i. e., odd cents on a winning ticket) in computing horse owners' share. The court found that, under the agreement, the track was merely to pay the 44.7% to the horse owners as a group, the distribution to individual members was discretionary with the track, and the individual owners had no right to a sum certain. Thus only the total collective interest was in controversy.

tration and preservation of a single fund. In such cases, the matter in controversy is the fund since the plaintiffs have no individual claims but only those of the class. The matter in controversy herein is the amount by which the State intends to cut back its expenditures on Medicaid for the medically needy, and that amount is clearly in excess of $10,000.

. . .

331 F.Supp. at 952. The *Bass* approach is also applicable to sustaining jurisdiction here.[51]

51. Notwithstanding the primacy of federal question jurisdiction in this matter, the parties have written the bulk of the jurisdiction section of their briefs on the subject of 42 U.S.C. § 1983 and its jurisdictional counterpart in 28 U.S.C. § 1343(3) and (4). If there were merit to plaintiffs' claim that the manner of their displacement deprived them of property rights in violation of the due process clause of the Fourteenth Amendment, the Court would clearly have jurisdiction under 28 U.S.C. § 1343(3) without regard to jurisdictional amount. Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). Since we have not reached the plaintiffs' constitutional claim on the merits, we prefer not to address the jurisdictional basis of that claim more fully. We will, however, consider the possible § 1343 basis of the plaintiffs' statutory claim, which is a stronger claim than the constitutional one. The jurisdictional issue as to the statutory claim is considerably more difficult than the issue as to the constitutional claim. Though we need not decide the issue in light of our holding that we have § 1331 jurisdiction, a few pertinent observations seem in order. It has been held that jurisdiction under section 1343(4) will lie where a violation of a federal statute is asserted. Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969), was an action by migrant farm workers seeking to compel state officials to comply with the Wagner-Peyser Act of 1933, 29 U.S.C. § 49 et seq. Although the *Gomez* court did not confront the questions whether the plaintiff's claim came within the "equal rights" provision of § 1343(3) or indeed the Supreme Court's related reservation in King v. Smith, 392 U.S. 309, 313 n. 3, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), as to whether a suit challenging state AFDC provisions only on the ground that they are inconsistent with a federal statute may be brought in federal courts, it did hold that § 1343(4) provides jurisdiction for all claims stated under 42 U.S.C. § 1983. According to *Gomez*, section 1343(4) confers jurisdiction to recover "under any Act of Congress providing for the protection of civil rights." Because 42 U.S.C. § 1983 is such an Act of Congress, and by its terms provides a cause of action for deprivation of rights secured by the "laws" of the United States, jurisdiction would seem to lie for a violation of any federal statute regardless of the amount in controversy. *See also* Bass v. Rockefeller, 331 F.Supp. 945, 949 n.5 (S.D.N.Y.1971). This view of § 1983 finds support in City of Greenwood v. Peacock, 384 U.S. 808, 829–830, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1964). There were, however, alternate jurisdictional grounds in *Gomez*, including 28 U.S.C. § 1337, governing actions arising under a statute regulating interstate commerce. The question of § 1343(4) jurisdiction for any violation of a federal statute by a state official is still subject to some doubt, however, since the effect of *Lynch*, a constitutional case, on statutory claims is as yet unclear. *See* Note, The Expanding Scope of Federal Civil Rights Jurisdiction, 3 Loyola U. (Chi.) L.J. 359 (1972). But even if we were to follow *Gomez* and hold that federal jurisdiction under 28 U.S.C. § 1343(3) or (4) will attach to a purely statutory claim, the requisites of these sections would have to be met and it is not certain that they have been here. PAAC is clearly an instrumentality of the City, thereby partaking of state action. Temple, as PAAC's delegate agency, might be considered an agency of the state for purposes of this case. The effect of 42 U.S.C. § 2790 ("Designation of community action agencies") is unclear, to say the least. Temple argues that it, and not PAAC, established the advisory boards and could therefore dissolve them. If Temple is thus alone responsible for the handling of the advisory board situation in this case, then the case is even harder than if PAAC is involved. As to Temple's nexus with the state as a state-supported university, the record is not sufficiently detailed for us to determine whether the actions of Temple are state action, hence taken under color of state law. *See* Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973). And, with respect to § 1343(3) and the nature of the deprivation alleged, there has been no claim of denial of equal protection or "privileges and immunities," and it is questionable whether the conduct of defendants can be said to rise to constitutional proportions in terms of due process, or would otherwise create a § 1983 claim. However, it might be argued that the Economic Opportunity Act is an act "providing

### 3. *Exhaustion of Remedies*

■ Defendant Temple points to 45 C.F.R. § 1060.1–3(b), which allows the presentation to "the governing boards of grantee organizations" of petitions, signed by 50 to 100 community spokesmen, complaining of (1) inadequate representation on a grantee board, (2) inability to influence the character of programs, or (3) grantee refusal to fund programs proposed by the poor. Such complaints must be considered at a public hearing, and OEO must be notified of each petition and of its disposition. In addition, the Regulations "encourage" complaints from poor people about the operation of OEO-funded programs. 45 C.F.R. § 1060.1–3(b)(4). The argument which flows from the foregoing is that the Court should refuse to decide this dispute because plaintiffs have not exhausted their administrative remedies.

■ The exhaustion claim ·is without merit for a considerable number of reasons, and we dwell on it only because of the vigor with which it was advanced. The petition procedure does not clearly encompass complaints by policy advisory boards that the grantee and delegate agency are attempting to dissolve and replace them. A procedure established to deal with one problem need not be pursued by a grievant with a different problem. The regulation, furthermore, is permissive only, and it is well settled that exhaustion of administrative remedies is required only when the administrative remedy is clearly designed as a mandatory precursor to judicial review. Nemitz v. Norfolk & W. Ry., 436 F.2d 841 (6th Cir.), aff'd, 404 U.S. 37, 92 S. Ct. 185, 30 L.Ed.2d 198 (1971); Woods v. Ginocchio, 180 F.2d 484 (9th Cir. 1950). We also note (see p. 1083) that HOC complained to both PAAC and OEO about the role dispute.

■ In addition, in view of PAAC's involvement in the events giving rise to this lawsuit, review by PAAC as suggested by the Regulations would be an exercise in futility. A plaintiff need not exhaust ineffective administrative remedies. Marsh v. County School Board, 305 F.2d 94 (4th Cir. 1962); Rackley v. School District, 258 F.Supp. 676 (D.S.C.1966).

■ Insofar as defendant Temple refers to § 1060.1–3(b)(4) of the Regulations, which encourages poor persons to express complaints to OEO about the operation of OEO-funded programs, it is not at all clear that this encouragement survived the transfer of these two health centers from OEO to HEW. Additionally, an encouragement to express complaint is not a prescribed administrative remedy. The opinion of the Supreme Court of California in Rosenfield v. Malcolm, 65 Cal.2d 559, 55 Cal.Rptr. 505, 421 P.2d 697 (1967), is instructive in describing what con'stitutes an administrative remedy:

> Our courts have repeatedly held that the mere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an "administrative remedy" unless the statute or regulation under which that power is exercised establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties.

55 Cal.Rptr. at 509, 421 P.2d at 701. Section 1060.1–3(b)(4) of the Regulations does not establish any machinery for the review and resolution of complaints and does not indicate what action, if any, might ever result from the expressing of a complaint. Certainly plaintiffs need not embark on such an uncertain course before bringing their complaint to court.

---

for equal rights of citizens or of all persons within the jurisdiction of the United States."

In view of these problems, and having found that federal question jurisdiction obtains, we need not venture into the thicket and thus do not decide whether we have jurisdiction under 28 U.S.C. § 1343(3) or (4).

 There are still other reasons why the exhaustion doctrine is inapplicable here. Courts will not insist on exhaustion when the particular issue involved is a constitutional and/or legal one and is not one addressed to a particular area of administrative expertise. Wills v. United States, 384 F.2d 943 (9th Cir. 1967), cert. denied, 392 U.S. 908, 88 S.Ct. 2052, 20 L.Ed.2d 1366 (1968). The case at bar presents constitutional and legal issues—the power of Temple and PAAC to dissolve plaintiff Boards in the way that they have attempted. Furthermore, courts are particularly reluctant to insist on exhaustion when the harm to the complaining party increases with the passage of time. Plaintiffs are clearly injured as the period of their forced separation from the program lengthens. Thus it would not be appropriate in this case to require exhaustion. We also note that insofar as plaintiffs may be correct that this action is properly brought under 42 U.S.C. § 1983, it is fundamental that exhaustion is not required. Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).[52]

B. *The Statutory Mandate of Maximum Feasible Community Participation: What Does It Require and Was It Fulfilled in the Circumstances of This Case*

1. *Introduction*

 At the outset of this Opinion we discussed preliminarily the concept of "maximum feasible community participation" as it is set forth in the Act, the Regulations, and the Guidelines.[53] Our initial review demonstrated that these enactments are honeycombed with references to the community participation requirements which, as applied to the facts of the case, may be recapitulated somewhat as follows:

(1) community participation is an essential objective of programs created under the Economic Opportunity Act. *Cf.* 42 U.S.C. §§ 2781(a)(4), 2809(a)(4)(A)(ii), 2811; 45 C.F.R. § 1060.1–2(a)(1, 5); OEO Guidelines (P–105), IV(B).

(2) community participation is to be regular and continuous. 42 U.S.C. § 2795(b)(4); 45 C.F.R. § 1060.1–2(a)(2).

(3) Temple and PAAC have a duty to involve plaintiff Boards meaning-

---

52. Defendant Temple has also argued that neither the HOC nor the CGHS Board of Directors properly authorized the commencement and pursuit of this litigation. We find this contention to be lacking in merit too.

Apparently Mrs. Wilson, president of the HOC Board, authorized institution of the lawsuit before obtaining Board approval; however, we find that the Board properly ratified Mrs. Wilson's action, and that the ratification related back. *See* In re Eastern Supply Co., 267 F.2d 776 (3d Cir.), cert. denied, 361 U.S. 900, 80 S.Ct. 208, 4 L.Ed. 2d 156 (1959). The record does not support Temple's contention that notice of meetings (for ratification purposes) was not properly sent to all board members of record or that a "significant" number of persons purporting to be board members had been in office in excess of the authorized time. In any event, whoever constituted the valid HOC board has had full knowledge of the action taken by its president and

has failed to repudiate it. Indeed, several members of HOC testified for it in the case. Such failure to repudiate constitutes acquiescence under Pennsylvania law which will bind the corporation. *See* Rednor & Kline, Inc. v. Dept. of Highways, 413 Pa. 119, 196 A.2d 355 (1964).

As to CGHS, we credit Mr. Shambourger's testimony that the suit was authorized at a meeting of the executive committee duly called and held prior to the institution of this suit at which a quorum was present, and that the full board later ratified the action. We also find that the CGHS bylaws authorize such action and that the incipient merger of CGHS and HOC did not occur until after the action was filed, although were the latter fact not so, it would not alter the result.

53. While our principal reference has been (and is) to OEO Guidelines (see note 8), we advert to parallel HEW Guidelines as well.

fully in the comprehensive health services programs, and plaintiffs have a corresponding right to participate meaningfully and effectively in this program. *Cf.* 42 U.S.C. §§ 2781(a)(4), 2795(b)(4), 2809(a)(4)(A)(ii), 2811; 45 C.F.R. § 1060.1–2(a)(1)–(5), (b)(1, 3, 5); 45 C.F.R. § 1060.1–3(a)(2); HEW Guidelines (P–105), IV (B), V(E, F); HEW Guidelines (P–106), p. 3.

(4) Temple and PAAC have a statutorily imposed duty to support plaintiffs by providing training and technical assistance. 42 U.S.C. § 2795(b)(4); 45 C.F.R. §§ 1060.1–2(b)(1), (2)(i–j) (made applicable to delegate agencies by §§ 1060.1–2(b)(5)(i)), 1060.1–3(2)(b).

(5) a community action program, such as the comprehensive health services program, must be designed so as to utilize the insights of the poor into their own problems, and developed and implemented so as to build local leadership and instill a sense of self-sufficiency in the residents of the area served. 42 U.S.C. § 2781(a)(4); 45 C.F.R. § 1060.1–2(3, 4).

The November 2, 1970, Memorandum of Understanding between the Director of OEO and the Secretary of HEW governing the transfer is also important to the case, for it details the conditions of transfer and the policies that are to apply to the transferred projects. *Inter alia,* it states:

The goals of Comprehensive Health Services projects will be furthered by HEW in the administration of the grant program for the support of the transferred projects. These goals, in accordance with the concepts of OEO program guidelines, will be the maintenance of programs designed to:

. . . *ensure the active meaningful involvement of the consumers of health care,* including full participation of persons eligible to receive services and the community in implementing the program of the trans-

ferred projects as described in Section V(d).

Memorandum of Understanding (Memorandum), ¶ 1 (emphasis added). The Memorandum requires that transferred projects such as the CGHS and WNT health centers maintain an organizational structure in which health consumers play a significant role in the determination of policy for the centers. It provides that the governing or policy advisory board:

*shall* participate in such activities as *the development and review of applications for HEW assistance to the Center,* the establishment of program priorities, *the selection of project director,* the location and hours of the Center's services, the development of employment policies and selection criteria for staff personnel, the establishment of eligibility criteria and fee schedule, the selection of neighborhood residents as trainees, the evaluation of suggestions and complaints from neighborhood residents, *the development of methods for increasing neighborhood participation,* the recruitment of volunteers, the strengthening of relationships with other community groups, *and other matters relating to project implementation and improvement.*

Memorandum, ¶ 5(d)(2) (emphasis added). This language parallels the provisions of the OEO Guidelines.

The rationale of the community participation requirement is explained to some degree in the Congressional statement of purpose quoted above (see p. 1074). The underlying philosophy of the Act is also expressed in the Regulations at 45 C.F.R. § 1060.1–2(a)(3):

(3) The Community Action Program is based upon the recognition that poor people possess talents and resources essential to reducing the problems of poverty. They often have unique insight into their own problems and valuable knowledge about the effect on their own lives of the programs designed for their benefit.

*Their participation in the development of those programs is essential to building understanding and the will of the entire community to bring an end to poverty and to achieve effective communication between the poor and the non-poor.* Far more relevant, sensitive, and effective programs and plans will come out of their participation.

Perhaps the best discussion of the general approach to the War on Poverty exemplified by the Act appears in Cahn & Cahn, *The War on Poverty: A Civilian Perspective*, 73 Yale L.J. 1317 (1964). While the Cahns' article is commentary and not legislative history, its vivid insights into the rationale of the Act are helpful to our understanding of the issues before us.

The Cahns' analysis proceeds from the distinction they describe between the "military" approach to attacking urban poverty as contrasted with the "civilian perspective." As the authors see it, the military approach was characteristic of pre-OEO programs attacking urban poverty: a war fought by professionals on behalf of the citizenry through service programs, administered piecemeal to alleviate hardship in particular cases, retaining and utilizing the support and resources of the incumbent political administration and major local and charitable institutions, carried on in faithful adherence to the originally mapped plan, and fundamentally characterized by a donor-donee relationship between agency and client. This approach, say the authors, has failed:

Poverty in America is not just a lack of material goods, education and jobs; it is also a sense of helplessness, a defeatism, a lack of dignity and self-respect, all of which are externally confirmed in varying degrees.

. . . [I]t by no means follows that the provision of services and the supplying of material wants will mold a sense of self-respect. . . .

The most disturbing defect of [the military approach] lies in its record of enervating existing leadership, failing to develop potential leadership, undercutting incipient protest, and manipulating local organizations so that they become mere instruments of the comprehensive strategy. A service-oriented program not only neglects to provide for and instill the civilian perspective; it is likely to be subversive of that perspective, particularly because of the donor-donee relationships which are established. All too easily such relationships become a means of perpetuating dependency rather than terminating it. A service program fills a need, but experts, not recipients, designate the need to be filled and establish the criteria for eligibility for aid. Typically, there is no effective means of challenging the basic criteria or for obtaining review of particular decisions applying those criteria. The pattern of aid is one of a donee's unquestioning acceptance, of an expert's dictation of what is "good for the client," and of an administrator's unchecked and unreviewable authority to terminate assistance. That power defines a status of subserviency and evokes fear, resentment and resignation on the part of the donee.

73 Yale L.J. at 1321–22 (footnotes omitted).[54]

Because of the deficiencies of the military approach, the Cahns urge the merits of the "civilian perspective": "one of dissent, of critical scrutiny, of advocacy, and of impatience," and one which:

will require that what Madison termed the "censorial power" be vested in the

---

54. The authors also criticize the military approach for other failures. They view it as monopolistic. Insofar as staff personnel are newly recruited, they feel that such personnel will be reflective of the views of the persons from the major political, social, economic, educational, and charitable institutions which control the programs. And, insofar as local leaders appear who feel that the program is doing too little too slowly, "they can be silenced, undermined, discredited, or hired."

people over the military. This means that the ultimate power to govern must not only reside with the governed, but that such power must be susceptible of continuous and effective, rather than nominal and sporadic, exercise. It must include both the power to give and to withhold assent. The ultimate test, then, of whether the war on poverty has incorporated the "civilian perspective" is whether or not the citizenry have been given the effective power to criticize, to dissent, and where need be, to compel responsiveness.

*Id.* at 1329. One reason for fostering and, where appropriate, subsidizing institutions and vehicles of dissent in slum communities is, in the authors' view, that:

free expression by the slum community is a concomitant of our faith in the dignity and worth of its individual members. The denial of effective censorial power to the poor regarding the most fundamental conditions of their existence—their needs and aspirations —is a denial of their own worth and a confirmation of their impotency and subserviency. And it will be so perceived by them. . . .

They add:

To date the silence of the poor has deprived us of a major relevant source of information and insight. We have paid for the lack of this information in other social experiments—public housing, urban renewal, welfare programs—in large part because we have not taken steps to assure that the censorial power was effectively vested in the people who were the subjects of

such experiments. Token approval, acquiescence, and resignation have been eagerly equated with meaningful citizen participation. . . .

*Id.* at 1330.

We do not suggest that the Economic Opportunity Act encompasses the Cahns' definition of the "civilian perspective," for some of their ideas clearly transcend the Congressional language. But they do correctly assert that the Act:

manifests an awareness of the dangers of a purely military approach, for it requires "maximum feasible participation" by the poor themselves. Thus, there is an explicit legislative vehicle for the civilian perspective and a clearly expressed mandate to give that provision content. . . .

*Id.* at 1318 (footnote omitted). It is instructive to compare with the approach taken by the Cahns the language of Judge Biggs in *North City II, supra.* That case dealt with the Model Cities Act, which speaks of "community participation" in less vigorous language than does the Economic Opportunity Act of 1964, but Judge Biggs observed:

Perhaps the best expression of Congress' intent in passing the Act was employed by plaintiffs' counsel in oral argument in this court: *vis.,* "Power to the powerless," that is to say, it was the intention of Congress to cause the poverty-stricken citizens of our larger cities to improve their lot by their own efforts.

456 F.2d at 813–814. The similarities in interpretation are apparent.[55]

There are several fundamental issues in this case. What we have described as the dominant question relates to the dis-

55. *See also* Rosenblum, *Controlling the Bureaucracy of the Antipoverty Program,* 31 Law & Contemp.Prob. 187, 205–06 (1966) (footnote omitted):

Deeds that are the product of participation . . . instill a commitment to the processes and institutions that engender them. We must seek through the poverty program and the controls we place over it, therefore, to bolster and multiply the factors that make people ar-

ticulate and increase their participation. The poor have been one of the "forgotten groups," or "those who suffer in silence," because, until recently, they have had neither opportunity nor incentive to organize, to establish lobbies, or to take action. Our objective in increasing participation is not to create a bureaucracy of the poor to countervail the bureaucracy of the poverty program, but rather to fortify the ideology of democracy. . . .

placement of the plaintiff Boards, but that question subsumes two issues. The first is whether there are any limitations at all upon the power of a delegate agency such as Temple to dissolve a given program advisory board and replace it with a new citizen participation component. If there are limitations on this power, such limitations are in the nature of maximum feasible community participation requirements; hence the second issue is whether there was such participation in the displacement of plaintiff Boards, or whether under the circumstances of the case the delay of plaintiff Boards in effecting a merger justified the defendants' actions. The other major question in the case, which we reach only if we find that the plaintiff Boards were improperly displaced, is whether the Boards were afforded a role consistent with the statutory mandate in terms of their participation in the program budget and selection of the project director. The positions of the parties on these issues are widely disparate.

2. *Does a Delegate Agency Possess the Power, Free of Limitation, to Dissolve and Replace a Program Advisory Board*

■ The proper disposition of the first issue is clear. We reject Temple's argument that there are no limitations upon the power of a delegate agency to dissolve and replace an advisory board. The argument is that: (1) the statute itself does not contemplate the existence of program advisory boards, which exist only by virtue of a provision in the Regulations that a delegate agency must "establish" a program advisory board (45 C.F.R. § 1060.1–2(b)(5)(iii); (2) the Regulations and Guidelines impose no express limitations upon the powers of a delegate agency insofar as dissolving and replacing an advisory board is concerned; (3) absent a statutory limitation, the general rule is that the power to establish or appoint necessarily carries with it the power to dissolve or remove; and (4) to hold that defendants do not have that power un-

less its use is first agreed to by plaintiffs would mean that such a decision and, ultimately, control of the entire program would really rest in plaintiffs' hands, which is not the intent of the law.

The answer to these arguments is that if the delegate agency had such an absolute power unilaterally to dissolve community participation components, then "community participation" would be meaningless because the grantee and the administrative agency would be free to dismiss any community board arbitrarily whenever they disagreed with the community board's views or, indeed, whenever they felt like it. This approach would thwart the entire thrust of the statute under which these health centers were created and would negate the effort to have community residents apply their own insights into their own problems to programs designed to affect their lives. The applicable law did not require the creation of community boards merely for the purpose of having these boards serve as administrative units to be utilized or dissolved at the whim of the delegate agency or grantee. The statutes, Regulations, Guidelines, and Memorandum mandate the involvement of community representatives in the process of program planning, development, and implementation, in which the administering agency and the community board are to cooperate. Our rejection of Temple's argument is buttressed by a consideration of the applicable canons of statutory construction.

■ It is elementary that the main function of statutory construction is to give effect to the intention of Congress as expressed in the statute. In terms of source material, we of course look first to the statute itself to ascertain its plain meaning and to its legislative history. But in a matter such as this one, we must go beyond the statute and the legislative history and look to several other sources. First, we look to the Regulations promulgated under the statute, which have the force and effect of law. Federal Crop Insurance Corp. v.

Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L. Ed. 10 (1947). Secondly, we look to the "contemporaneous construction" of the statute by the administering agency, for it is entitled to great weight. Federal Trade Commission v. Mandel Brothers, Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed. 2d 893 (1959). In this instance that construction is reflected by the Guidelines. See *North City I, supra,* where the court referred to a form of administrative guideline termed a demonstration letter as the primary statement of the policy of the Department of Housing and Urban Development concerning the meaning of "citizen participation" as required by the Model Cities Act in Model Cities programs and in effect found its definition of "citizen participation" in that letter. And see also Chacon v. Hodgson, 465 F.2d 307 (7th Cir. 1972), where the court, citing *Mandel,* looked to Labor Department regulations which articulated criteria for resident participation in the prime sponsor and delegate agencies of a concentrated employment program.[56]

 There are other principles of statutory construction which will aid us in our deliberations. A statute must be construed as a whole. Therefore, the strongly expressed purpose for effective community participation, 42 U.S.C. § 2781(a)(4), the directive to community action agencies to establish effective procedures for community participation on a regular basis, 42 U.S.C. § 2795(b)(4), and the encouragement to develop neighborhood centers so as to maximize community participation in center planning, policymaking, adminis-

tration, and operation, 42 U.S.C. § 2811, must be read as applying to the section authorizing the establishment of comprehensive health services projects, 42 U.S. C. § 2809(a)(4)(A). Moreover, we must assess the spirit of the Act as a factor in its interpretation, and our construction of the statute in the case before us must be consistent with that spirit. A consideration of the Act as a whole, including its spirit, and the Regulations and Guidelines renders the contention that the delegate agency may replace the community participation component at will totally inappropriate. Because, however, of the vigor with which it has been pressed, we must extend our discussion in this area to address Temple's argument that the power to appoint carries with it the power to remove, and demonstrate why that argument misses the mark.

Temple has advanced this argument with the citation of a large number of cases. Most of those cases deal with public officials who were discharged by superior executive officers: Ex parte Hennen, 13 Pet. 230, 38 U.S. 230, 10 L. Ed. 138 (1839) (a district court clerk); Ware v. United States, 4 Wall. 617, 71 U.S. 617, 18 L.Ed. 389 (1866) (a post office official); Burnap v. United States, 252 U.S. 512, 40 S.Ct. 374, 64 L. Ed. 692 (1920) (a landscape architect); Hargett v. Summerfield, 100 U.S.App. D.C. 85, 243 F.2d 29, cert. denied, 353 U.S. 970, 77 S.Ct. 1060, 1 L.Ed.2d 1137 (1957) (a postmaster); Jenson v. Olson, 353 F.2d 825 (8th Cir. 1965) (a welfare caseworker); Medoff v. Freeman, 362 F.2d 472 (4th Cir. 1966) (an agriculture

---

56. It is appropriate to note here that Temple and PAAC in their refunding requests to OEO and to HEW have expressly agreed as a condition of receiving federal funds to abide by OEO and HEW general conditions and policies, which include the applicable Guidelines:

 It is understood and agreed by the undersigned that any grant received as a result of this application will be subject to the general conditions governing CAP grants.

Temple and PAAC are therefore legally bound also as a matter of contract to afford plaintiff Boards meaningful participation in the comprehensive health services program. To permit defendants on the one hand to profess to the federal government that they will abide by the Comprehensive Health Services Guidelines so that they can obtain federal funds for the project and on the other hand to tell the community boards that they are not bound by these Guidelines because the Guidelines allegedly lack "the force of law" would be unconscionable.

department official); and Langford v. City of Texarkana, 337 F.Supp. 723 (W. D.Ark.1972) (three employees of a Model Cities program). Other cases relied upon deal with public officials whose terms were shortened because of legislative action. Butler v. Pennsylvania, 10 How. 402, 51 U.S. 402, 13 L.Ed. 472 (1850); Lanza v. Wagner, 11 N.Y.2d 317, 229 N.Y.S.2d 380, 183 N.E.2d 670, cert. denied, 371 U.S. 901, 83 S.Ct. 205, 9 L.Ed.2d 164 (1962). All of these cases are inapposite. Neither PAAC nor Temple is a legislature nor an "employer" of the plaintiff Boards in the usual sense of that term, which is also the sense in which it is used in the government employment cases cited by Temple. Plaintiffs are agents not of defendants, but of the neighborhood residents served by the program. The Boards were created only because of the unique statutory interposition of this third force. Moreover, we note that the trend in the public employment cases has been to disfavor arbitrary exercise of the power to discharge in favor of a more democratic and procedurally circumscribed exercise of that power.

The remaining case upon which Temple relies is Ocean Hill-Brownsville Governing Board v. Board of Education, 30 A.D.2d 447, 294 N.Y.S.2d 134 (1968), aff'd, 23 N.Y.2d 483, 297 N.Y.S.2d 568, 245 N.E.2d 219 (1969). The Ocean Hill-Brownsville experiment in decentralized public education was a national cause célèbre for quite some time. The public school system in New York City had historically been managed and operated by a single board of education. However, in 1967 the Board of Education committed itself to a policy of decentralization of its operations. As an incident of that policy it experimented with the concept of local district boards for three of the city's thirty school districts. Ocean Hill-Brownsville was one of the three school districts chosen and, in accordance with a state statute authorizing temporary experimentation in New York City with reconstituted local district boards in defined communities

"to allow greater community initiative and participation in the development of educational policy for the public schools," the Board of Education created the Ocean Hill-Brownsville Governing Board. At first the powers of the local school board were advisory only. In 1968, however, the Board of Education, as directed by statute, delegated certain of its functions to the Ocean Hill-Brownsville Governing Board. Within a few months, following a disagreement between the Board of Education and the Governing Board over actions taken by the latter, the Board of Education suspended the Governing Board without charges, notice, or hearing. The Governing Board and all but one of its members commenced suit charging the Board of Education with statutory due process violations and seeking reinstatement. Relief was denied. The New York Court of Appeals, in dismissing the allegation of statutory violations, stated:

> In summary, in the absence of legislation giving this local board autonomy, a fixed term of office, or a tenure terminable only for cause, the board is subject entirely both as to its powers and term of office to its creating agency, the city Board of Education.

297 N.Y.S.2d at 572, 245 N.E.2d at 222.

While closer to this case on its facts than the public employment cases, *Ocean Hill-Brownsville* is likewise inapposite, for the relevant statute expressly provided that "[s]uch board of education, upon the establishment of such local board districts, shall have the power to appoint . . . and *remove at its pleasure,* a local school board . . . . N.Y.Educ.Law, c. 16, § 2564(2) (McKinney's) (emphasis added). The Court of Appeals emphasized that the enabling statute explicitly provides that the local board may be removed at the pleasure of the city board. In the case at bar, neither the statute, the Regulations, the Memorandum, nor the Guidelines provide that a policy advisory board is removable at the pleasure of the delegate

and grantee agencies, and as we have shown, such provision would be antithetical to the spirit of the Act.[57] *Ocean Hill-Brownsville* is therefore not precedential to the case before us.

3. *The Proper Standards Governing Replacement of a Community Participation Component and the Breach of Those Standards in This Case*

The conclusion that defendants do not possess the unlimited right to remove the plaintiff Boards does not mean that control of the program lies with the advisory boards, as defendants argue *in terrorem*. What follows instead is the conclusion that a change in a community participation component must be attended by maximum feasible community participation, *i. e.*, observance of the statutory mandate. This much has been established beyond doubt by the *North City* trilogy.

The *North City* cases arose because of certain changes in the Philadelphia Model Cities Plan made unilaterally by the City and HUD which reduced the participation of the existing citizen component group. That component, North City Area-Wide Council, Inc., was not consulted or permitted to participate in the planning in connection with the changes. In *North City I,* Judge Adams held:

> the issue is not citizen veto or even approval, but citizen participation, negotiation, and consultation in the major decisions which are made for a particular Model Cities Program. While not every decision regarding a Program may require full citizen participation, certainly decisions which change the basic strategy of the Program do require such participation.

The June 9th decision of the City and the July 3rd statement of HUD made such fundamental changes in the Philadelphia Program. Previously, that Program had contemplated a much heavier involvement by the designated citizen participation component, AWC [the plaintiff]. This involvement was drastically reduced by the unilateral actions of the City and HUD. The Secretary [of HUD] therefore violated the Act when he accepted a proposal for major modification of the Model Cities Program from the City which made clear on its face there had been no citizen participation in its formulation, and when he imposed additional significant terms on his own without citizen consultation.

428 F.2d at 758.

*North City I* reversed the district court's grant of defendant's motion for summary judgment. On remand, the court held a full hearing at which it was learned that a new citizen participation component was then functioning; indeed, the district court found that with the new citizen component the program was functioning with the widespread citizen participation required by 42 U.S.C. § 3303. On appeal from the dismissal, after that hearing, of plaintiffs' complaint, and notwithstanding the finding of continued citizen participation in the program, the Court of Appeals in *North City II* again reversed, in essentially the same terms, and ordered reinstatement of the Area-Wide Council as the citizen participation organization for the Model Cities program. The significance of *North City II* is that the fact of present compliance in the form of a new committee did not cure the invalid actions

---

**57.** The *Ocean Hill* case is also distinguishable from the case at bar on the basis of the nature of the legal framework governing education in the State of New York. Unlike the law governing comprehensive health centers, with its emphasis on involving local residents in the planning, development, and implementation of programs, New York's law governing educational affairs establishes a clear hierarchy of authority with the power concentrated at the top:

[T]he control of educational affairs in this State derives from the State Board of Regents through the State Commissioner to the city Board of Education. The seat of control and responsibility lies in these, and only the Legislature, subject even then to some constitutional limitations, can change the locus.

297 N.Y.S.2d at 571, 245 N.E.2d at 221.

taken without participation of the North City Council or otherwise moot the litigation. The implication of *North City II* for this case, then, is that the existence of the new single program advisory board created by PAAC and Temple cannot affect the result.[58]

■ The *North City* cases teach that citizen participation components have the right to be involved in all important decisions involving the program, or, put obversely, that the "maximum feasible community participation" requirement forbids the exclusion of the representatives of the poor from any part of the decision-making process which leads to a change in the form of that community participation. The *North City* cases do not, however, have occasion to articulate the quantum of the participation required or any standards. While that articulation will doubtless be best developed on a case-by-case basis, there are certain basic standards which emanate from the Act, Regulations, and Guidelines which appear fundamental:[59]

■ *First,* an established community participation component may be changed only with the full participation of the existing community board;

■ *Second,* the existing board must participate meaningfully and effectively throughout the entire decision-making process; it must have an influential voice and a major role in the process;

■ *Third,* the grantee and delegate agencies and the community board must bargain in good faith much as that term is used in the field of labor law, and the agencies must weigh the board's advice seriously (In this regard, we note that in *North City II*, the court's decree required that the North City Area-Wide Council, upon its reinstatement as the citizen participation organization for the Philadelphia Model Cities program, "negotiate in good faith" with the existing citizen structure for the purpose of integrating that structure into the organization of the Area-Wide Council.); and

■ *Fourth,* a change in the community participation component may not substantially reduce the quantum of community participation in a program.

It will be noted that these standards fall short of according the community representatives a veto power over changes in the community participation component of the program. But as the result of these standards, the advice given by the Boards has more weight than pure advice; instead, it has some measure of authority, and the Boards

---

**58.** The legal requirement of "maximum feasible participation" applicable in the case at bar is broader than the "widespread citizen participation" standard in the *North City* dispute. Accordingly, it imposes a stricter duty on defendants to seek community involvement in the administration of the health centers.

**59.** We are conscious of the fact that there is no prior case law in the area into which we now delve. But, as Chief Justice Burger observed in United States v. Little Lake Misere Land Co., 412 U.S. 580, 593, 93 S. Ct. 2389, 2397, 37 L.Ed.2d 187 (1973):

the inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts. "At the very least, effective Constitutionalism requires recognition of the power in the federal courts to declare, as a matter of common law or

'judicial legislation,' rules which may be necessary to fill in interstitially or otherwise effectuate the statutory patterns enacted in the large by Congress. In other words, it must mean recognition of federal judicial competence to declare the governing law in an area comprising issues substantially related to an established program of government operation." Mishkin, [*The "Variousness" of "Federal Law": Competence and Discretion in The Choice of National and State Rules for Decision,* 105 U.Pa.L.Rev. 797 (1957)] at 800.

*See also* Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), which are pioneering cases dealing with the obligation of federal courts to fashion federal law where federal rights are concerned.

are accorded a decision-making role.[60] These standards do not accord the full "censorial power" conceived of by the Cahns. However, we believe that, if followed, they will have the effect of providing what they have described as "critical scrutiny and dissent" by those with a different (civilian) perspective, and of compelling responsiveness. They will thus have the type of measurable impact upon the program which Congress intended.[61]

We turn then to the issue whether the standards which we have enunciated have been met in connection with the displacement of the plaintiff Boards. It would prolong an already long opinion to restate the findings of fact on what we have described as the matter of merger, but even the most cursory recollection reminds us that these standards were not met here. Evans's decree, as we have described it, thwarted meaningful participation at the outset.[62] The plaintiff Boards were not engaged in consultation or negotiation. They were simply told to merge within six weeks or else. The form of the merged board itself was decreed in advance by Hardy. No assistance of any kind was offered by the defendants with respect to the plaintiff Boards' deliberations. Moreover, the net result of the defendants' actions has been to reduce the extent of community participation in the program.

In sum, the actions of the defendants contravene the Act's policy of developing local leadership and instilling a sense of self-sufficiency in area residents. It will thus be necessary to set aside the actions of the defendants in dissolving the plaintiff Boards and in creating a new single merged advisory board, and to reinstate the plaintiffs as the advisory boards for the health services program.[63] We assume that Temple and PAAC will wish to pursue the question of a merged board. Needless to say, they may do so but must follow the standards which have been enunciated. We cannot foresee the results of such negotiations, although we trust that they will result in a merged board satisfactory to all.[64]

Before leaving this subject, we must deal with one additional contention advanced by both defendants, and particularly by defendant PAAC. It is that the requisite community input into the merger (and, *a fortiori*, the program itself) is supplied by the participation of PAAC and the Area B and D CAC's without the intervention of the plaintiff Boards. This contention is without merit. The Act clearly indicates that the community participation in each program is to be primarily by residents of the area served by that program:

"maximum feasible participation of residents of the areas and members of

---

60. *Cf.* Guidelines at 3 (emphasis added):
The project should: (a) insure that residents of the target area will have *decision making roles in the planning, development and operation* of the project, including site and personnel selection. (b) Make provisions for the *active participation and advice of residents* and practitioners from the project area in defining changing needs, special problems and major gaps in services.

61. In Burke, *The Threat to Citizen Participation in Model Cities,* 66 Cornell L.Rev. 751, 776 (1971), the author observed:
Courts would do well to see to it that appropriate legal safeguards follow citizens

when they themselves become a locus of power.

62. As we have noted in our Findings of Fact, Evans's "decree" was also not properly authorized in terms of PAAC's own bylaws.

63. Since the merger of the plaintiff Boards has progressed only to the point of an interim board, our Order will relate to the plaintiffs in their original structure.

64. If the plaintiff Boards do not negotiate in good faith, then Temple and PAAC will be justified in acting without them. If that happens, this case will have been an exercise in futility.

the groups served" (42 U.S.C. § 2781(a)(4));

"effective procedures by which the poor and area residents concerned will be enabled to influence the character of programs affecting their interests" (42 U.S.C. § 2795(b)(4));

"to assure that these services are made readily accessible to low-income residents of such areas [and] are furnished . . . with their participation" (42 U.S.C. § 2809(a)(4)(A)(ii)).

Thus, not only do the Regulations provide that each Community Action Agency has the responsibility of developing effective community participation "in each major program and in each of its target areas," 45 C.F.R. § 1060.1–2(b)(3)(i), but similarly, a delegate agency has the same responsibility of developing program-based or target area-based community participation when it operates a community action program. 45 C.F.R. § 1060.1–2(b)(5)(i).

▆▆▆ We have already noted (see p. 1090) that the CAC areas are roughly five times the size of the health program target areas. And, while the total population of the two target areas is 41,000, the population of the entire city is 2 million. When a Community Action Agency covers an area as large and complex as Philadelphia, its board cannot possibly provide extensive community participation in the planning, conduct, and evaluation of each and every program established under it, and thus resident participation, to be meaningful, must be channeled through local community participation components attached either to specific programs or to specific neighborhoods. No apparent purpose would be served by requiring "maximum feasible participation" of area residents in PAAC, a level more remote from the programs, and permitting a lesser standard of participation on program advisory boards, the level most closely connected to and affected by the program. We thus hold that the requisite community participation must be supplied by the program advisory boards; it cannot be supplied by PAAC.

4. *The Proper Standards Governing the Involvement of Program Advisory Boards with Respect to the Program Budget and Selection of the Project Director, and Their Non-Fulfillment in This Case*

The remaining issue is whether the plaintiff Boards were accorded their proper role in connection with the program budget and the selection of the project director. This issue turns also on how one views the role of plaintiff Boards. As we have indicated in our findings of fact, the defendants tended to view the plaintiff Boards as just another administrative component of the program. They at no time made a serious effort to involve the plaintiffs in the program budget; they ignored plaintiffs in connection with the selection of a project director, and in general excluded the plaintiff Boards from the decision-making process within the health program. While, as we have found, plaintiffs were permitted to participate in a number of areas of Center activity, and did so effectively, much of plaintiffs' participation was in the form of outreach—a voluntary effort on the part of plaintiffs to bring the centers and the communities closer together. When the plaintiffs turned inwards, toward participation in the policy-making for and the operation of the centers, they encountered resistance. In part this was due to the concentration of authority in the P. D. & E. unit.

▆▆▆ In contrast with the facts as we have found them, the Act is clear that community participation is to affect, indeed to influence, *the program*, not just parts of the program. Hence, we find that the standards which we enunciated with respect to displacement are applicable here. Modified to opera-

tional context, they may be stated as follows:

■ *First,* the Community Action Agency and its delegate agency must deal with the established board in good faith and must consult with it on all important matters affecting the program. In accordance with the Regulations and Guidelines, this includes such matters as the development and review of applications for HEW assistance,[65] the development of the program budget, the Centers' locations and hours of operation, the development of employment policies and selection of staff personnel, the establishment of program priorities, the fixing of eligibility criteria and fee schedules, the selection of neighborhood residents as trainees, the evaluation of suggestions and complaints from neighborhood residents, the development of methods for increasing neighborhood participation, the recruitment of volunteers, the strengthening of relationships with other community groups, and any other matters relating to project implementation and improvement.

■ *Second,* the community representatives must be permitted to participate meaningfully and effectively throughout the entire decision-making process; they must have an influential voice and play a major role in the process.[66]

■ *Third,* the grantee and delegate agencies must weigh the board's advice seriously; and

*Fourth,* the grantee and delegate agencies must provide the board with technical assistance so that it may participate more effectively in the process of *program planning, development, and implementation.*

The extent to which the plaintiff Boards were involved in the program budget and the selection of the program director did not meet these standards; hence, we shall issue appropriate injunctive relief to insure that the Boards will play a major role in those matters in the future. Although we did not have occasion to reach plaintiffs' other complaints, these standards would be applicable in those areas as well. Once again, we note that as we see it, the plaintiff Boards do not possess a veto power over the conduct of the program, much less have complete control over it, as their "position papers" indicate they would like. Neither do these "standards" purport to define the line of demarcation between administration and policy or answer with any degree of precision the inquiry of Judge Schmidt (see p. 1082) as to the precise nature of the authority of the plaintiff Boards, but they should set some helpful guidelines. And, if these standards are observed, the "military approach" will have been replaced with, or at least infiltrated by, the civilian perspective, whereupon plaintiffs should indeed be able to influence the program by critical scrutiny

---

65. Lower East Side Neighborhood Health Council-South, Inc. v. Richardson, 346 F. Supp. 386 (S.D.N.Y.1972), was an action seeking a preliminary injunction requiring the New York City Health & Hospital Corp. to continue the plaintiff as the local community participation unit in a comprehensive health services program similar to the one at bar. *Inter alia,* Judge Lasker noted, apropos of an affidavit by a plaintiff board member that the Hospital Corp. did not involve the plaintiff in preparation of the 1972–73 grant application, that it appeared that plaintiff would prevail in its contention that the Hospital Corp., in preparing the grant application, had violated HEW's rule contained in the Memorandum

of Understanding that "the Neighborhood Health Council shall participate in such activities as the development and review of applications for OEO assistance."

66. *Cf.* Chacon v. Hodgson, 465 F.2d 307 (7th Cir. 1972), where the court agreed that resident participation in planning must include a "defined, institutionalized role in policy-making." In *Chacon,* the court held that unresolved factual questions remained as to whether the operation of a concentrated employment program by the State Employment Service would diminish the area resident participation required by statute, precluding summary judgment.

and dissent and by positive suggestion, thus effecting the purposes of the Act.

### IV. *Conclusion*

The foregoing findings of fact and conclusions of law require that we grant the plaintiffs relief. Accordingly, we enter the following Order.

### ORDER

And now, this 8th day of August 1973, upon consideration of our findings of fact and conclusions of law, we enter the following Order.[67]

1. Defendants PAAC and Temple are hereby permanently enjoined from refusing to recognize plaintiffs as the duly constituted program advisory boards for the Temple Comprehensive Health Services Program except insofar as plaintiffs are supplanted as program advisory boards (by merger or otherwise) through a process which involves maximum feasible community participation in accordance with the standards set forth in the foregoing Opinion.

2. It is declared that the role heretofore accorded the plaintiffs by defendants PAAC and Temple with respect to their involvement in the program budget and selection of the project director has not comported with the community participation requirements of the Act. Said defendants are hereby ordered to accord to plaintiffs or their successor or successors a role in connection with the program budget and selection of the project director which comports with the standards set forth in the foregoing Opinion.

3. Defendants PAAC and Temple shall return to plaintiffs such books and records of plaintiffs as are in such defendants' possession.

4. The action is dismissed as to defendants Hardy and Evans.

---

67. It will be noted that we grant no relief against either Evans or Hardy. Evans has resigned as Chairman of PAAC and Hardy has been ousted as Executive Director, although he is contesting that ouster before another judge of this Court. The case against Evans is therefore moot. Moreover, an injunction against Hardy is not necessary to plaintiffs' position. Accordingly, the action will be dismissed as to Evans and Hardy.